[Nos. 22206-0-II; 22209-4-II; Division Two. July 2, 2002.]
22210-8-II; 22247-7-II;
22325-2-II; 22369-4-II.

THE STATE OF WASHINGTON, *Respondent*, v. JOHN FRANK REYES
TRUJILLO, ET AL., *Appellants*.

*Thomas E. Doyle, Patricia A. Pethick, Pattie Mhoon, Robert M. Quillian, Robert W. Huffhines, Jr.,* and *Alfred A. Bennett*, for appellants (appointed counsel for appeal).

*James J. Stonier, Prosecuting Attorney* (from October 17, 1997 to November 3, 1999), *Susan I. Baur, Prosecuting Attorney* (from December 28, 2000), and *Jill Johanson, Special Deputy Prosecuting Attorney* (from November 5, 1999 to April 5, 2000), for respondent.

QUINN-BRINTNALL, A.C.J. — This case comes to us from the trial of six codefendants in which the trial court gave the jury an accomplice liability instruction later declared defective in *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000).

On March 3, 1997, about 2 A.M., three carloads of young men went to the home of Bunny Vath.[1] Some of the young men fired 18 shots at Vath when he opened the door. Although wounded in the chest and abdomen, Vath survived the attack.

Within minutes of the shooting, the Cowlitz County Police apprehended one carload of the young men as they tried to escape. They apprehended the others in the ensuing days.

In June 1997, a jury convicted four defendants of first degree assault and, in the alternative, first degree attempted murder. Another two were charged and convicted of first degree assault only.[2]

---

[1] The victim testified at trial that his name is Bunny Vath. We note the charging documents for the codefendants refer to him as Bun Sean Vath. He uses Sean as a nickname.

[2] There were originally 15 defendants. Prior to trial nine pleaded guilty as follows: Aaron Sjoblom, Eric Mejia, Landen Harvill, Jered Harvill, and Chea Keo pleaded guilty to second degree assault; Christy Fowler pleaded guilty to misdemeanor rendering criminal assistance; and Vonnie Thol pleaded guilty to first degree reckless endangerment. The record before this court does not specify to

The six defendants, John Trujillo, Fernando Angel, Phan Kong, Vouty Thol, Van Veth, and Sok Krouch, now appeal to this court. They assign numerous errors, including error in the accomplice liability jury instruction, error in alternative charging, violation of the timely trial rule, and prosecutorial mismanagement. We affirm.

## FACTS

*The Shooting of Vath*

On March 3, 1997, at about 2 A.M., Patrick Webb was in his girl friend's living room in Kelso, Washington, when he saw three cars, a Prelude, a van, and what appeared to be a Monte Carlo, traveling down the street together. The drivers turned their headlights off as they approached the corner. And all three vehicles came to a stop. Approximately 15 young men got out of the cars, and 6 or 7 had red bandanas in their hands. They split into three groups and headed silently towards Vath's home. Webb had known Vath for about five years and he was acquainted with members of Vath's gang. Webb became concerned for the safety of his friend and her young son sleeping in the back bedroom of the house.

Someone knocked on Vath's door. Vath, who had been dozing on the couch, opened the door. Vath heard the gunmen say, "[F]ire," and the shooting began. 4 Report of Proceedings (June 16, 1997) at 457. At trial, Vath's brother recalled that he heard his brother say, "Who is it?" and then the shots being fired. 4 Report of Proceedings (June 16, 1997) at 389.

As Webb went to the bedroom, he heard a gunshot and saw someone wearing a red shirt shooting a short gun. Webb saw another person shooting some kind of machine gun that looked like a Tec-9. He did not see any shots being fired from the house.

what crime defendant Don "DJ" Byman pleaded guilty, nor does it identify the last defendant.

Other neighbors, the Coopers, had awakened to the sound of 10 to 15 gunshots. Donald Cooper heard voices and saw a group of people walk toward a van parked in front of his house. He testified, "I heard the van start up, and at the same time as the van started up, I saw taillights of another car in front of the van, which I didn't know was there before." 8 Report of Proceedings (June 20, 1997) at 1167. He saw both cars travel down the street with their lights off. The van returned a few seconds later, backed up, and left again, just as a police car was coming down the street.

*The Events Leading up to the Shooting*

The violence that erupted at Vath's house had its roots in events stemming several years. The long-standing friendship between Angel and Vath had soured due to intertwining romantic relationships and compromised allegiances. Then, in 1993, Vath was convicted of raping Angel's 11-year-old cousin. The shooting of Vath was the culmination of these events.

In a pretrial statement to the police, Angel stated that sometime around 1990-91, Vath and Angel both joined a gang called the Original Blood Troop. But the two men parted ways in 1993 when Vath was convicted of raping Angel's cousin and was sentenced to prison. Vath was released from prison toward the end of 1996. After his release, Vath threatened Angel and his family for testifying against him. These threats included phone calls threatening Angel's family and drive-bys where he mimed shooting them by pointing his finger as a gun.

In early 1997, the defendants were aligned as follows: Angel dated Christy Fowler in January and February of that year. Fowler lived in a house in Longview and Angel's sister, Elizabeth (Lizzie) Angel, lived upstairs with Kong and their three children. Angel and his cousin, Trujillo, often stayed with Lizzie and Kong. Kong had been in the Oriental Fantazy Boyz gang in Seattle but had moved to Longview to get away from that life.

Angel also had a daughter with Vannie Vath, the victim Bunny Vath's younger sister. When Angel and Fowler were

spending time together, Vannie Vath would call and threaten Fowler, claiming that Fowler was trying to keep Angel from seeing his daughter. And Bunny Vath periodically drove by the Fowler home and made gestures imitating shooting. Once, in response, Angel ran out the door and threw his hands up in the air, "[l]ike a challenge to fight." 3 Report of Proceedings (June 24, 1997) at 269. After Fowler broke up with Angel, she began dating Landen Harvill.

There was a confrontation on March 2 at the Fowler/ Kong/Lizzie Angel house in Longview. A group of people came to the house and began kicking the windows and yelling. Fowler heard Vath yell, "Fuck your family." 3 Report of Proceedings (June 24, 1997) at 284. Lizzie Angel saw about 15 people arrive, heard the same outburst, and dropped on the ground when she saw Vath reach into his jacket. Two to five shots rang out. Most believed Vath had "shot out" the building, but actually Kong had fired the shots from the porch to disperse the crowd.

Fearing that Vath would return the next night, Kong, Trujillo, and Harvill took Fowler's car to Seattle to recruit some Oriental Fantazy Boyz "homeboys" for assistance.

Chea Keo, a 14-year-old Cambodian boy from Seattle's White Center who pleaded guilty to second degree assault, testified at trial about being recruited and the shooting. Keo is a member of the Little Ruthless Boyz gang, the precursor gang of the Oriental Fantazy Boyz. Both gangs are "blood gangs" and use the color red.

Keo testified that he, Demeko Holland, Vorn and Veth, Krouch, and Thol were at a home in White Center when Kong and "two white guys" came to see them. 6 Report of Proceedings (June 19, 1997) at 842. According to Keo, Kong asked the Seattle group if they "would come and spend the night at his house and stuff like that. They said they needed backup . . . . [t]o go shoot somebody." 6 Report of Proceedings (June 19, 1997) at 849. The Seattle friends were told that the problem was a rival gang, the Sorenos. Kong and Trujillo asked Keo to get his gun and drove him to his house to get it. Keo's gun was a .45 caliber with two magazines

loaded with hollow point bullets. Keo gave the gun to Trujillo, who put the gun clips in his shoe. The group traveled I-5 south to the Longview-Kelso area.[3] Harvill drove Fowler's car; Krouch drove a minivan.

En route, Harvill called Fowler on a cell phone to report that "they had seven or eight guys with them and one of them that were [sic] in the car with him had a gun." 3 Report of Proceedings (June 24, 1997) at 293.

As the group traveled toward Longview, Fowler learned that Vath had done another drive-by shooting. Together with Lizzie Angel and the children, Fowler went to Angel's aunt's house and called the police. According to Angel, the police "told us not to do anything stupid, they would take care of everything." Clerk's Papers (Angel) at 2. Officer Hallowell, who responded to the house, testified that less than six hours before Vath was shot, Angel told him "that if [you] can't do anything, [I'm] going to kill the mother-fucker." 2 Report of Proceedings (June 23, 1997) at 235.

Later that night, the group, including the Seattle re-cruits, gathered at Fowler's. Aaron Sjoblom, a friend, testi-fied that another friend, Don "DJ" Byman, brought 22-ounce cans of beer and that a substantial amount of alcohol was consumed. Gradually, the group began to talk about confronting Vath. Some wanted to fistfight; others wanted to "put him to sleep." Clerk's Papers (Trujillo) at 8. Sjoblom testified that he heard Angel say to Veth and Thol, "Knock on the door and shoot." 1 Report of Proceedings (June 23, 1997) at 21.

The men were armed. Harvill and his brother left the apartment for a while and returned with a Tec-9 semiauto-matic weapon. Kong had the gun that he had fired the previous night. All weapons were visible. The women left with the children and took a room at the Motel 6 in Kelso to avoid the gunfire.

---

[3] After the shooting, police arrested Thol and transported him to jail in a patrol car. Following a routine posttransport search of the vehicle, Sergeant Davenport found a magazine for a .45 caliber Sig Sauer, loaded with four live .45 caliber hollow point rounds.

About 2 A.M., the young men got into the three cars that Webb and Cooper saw and went to Vath's house. Angel fired the Tec-9 and then gave it to Veth, who also fired. Thol fired the .45. Trujillo held Kong's gun but it was jammed. Kong tried unsuccessfully to fix it. Krouch remained in the van. A total of 18 rounds created 43 holes in Vath's home. Two shots hit Vath in the abdomen and chest. But Vath's brother managed to pull him to safety and call 911. Several neighbors, Webb, Mr. Thompson, and the Coopers, heard the shots and called the police as well.

*The Arrest*

The police arrived within minutes. When Krouch saw them, he drove off in the van with several defendants. But they were apprehended a short distance away.

Veth was left at the scene.[4] Veth hid the gun he had been using and walked to the police station to "report" that his parents' van was broken down on the freeway. But when he went into the police station he encountered his younger brother. Veth changed his story and showed the police the bushes where he had hidden the Tec-9.

Detective Stair found three guns in Krouch's van—a 9 mm Helwan semiautomatic, a Sig Sauer .45 semiautomatic, and a Davis Industries .380 semiautomatic. The weapons were in a hidden compartment behind a panel in the van.[5] Four red bandanas were also found in the van.

The other two cars returned to the Motel 6. Fowler testified that Angel and Mejia showed up first. Fowler stated, "[Angel] said that he had a Tec-9 and he emptied a clip into Sean and he shot him in the head." 3 Report of Proceedings (June 24, 1997) at 309. Kong and the other three arrived shortly thereafter. They had just seen the police stop the van and arrest the others.

---

[4] Krouch circled around the block to pick up Veth but he had not made it back to the van before the police arrived.

[5] Keo testified that he saw one of the others put the gun into "the hideout deal . . . [a] little box inside the car." 6 Report of Proceedings (June 19, 1997) at 880.

The assailants in the van gave statements that night, some of which were admitted into evidence during the trial. The other assailants were arrested two days later and statements were taken from them as well.

*The Charges*

On March 5, 1997, the State filed charges against 15 defendants in connection with the Vath shooting. Defendants filed numerous pretrial motions, discovery proceeded, and proceedings came before the trial court in rapid succession.[6] Defendants complained frequently about delays in receiving discovery materials, particularly ballistics reports and notice of gang expert witnesses. They also complained of lack of notice of codefendant witnesses who were fiercely bargaining and pleading to various charges in exchange for leniency and agreeing to testify at trial.

On April 30, 1997, the State requested a five-day continuance to obtain the testimony of Sergeant Davenport. Davenport had left the country before the trial date was set and the subpoenas issued. The defense objected. The State then asked the court to sever Thol's trial. The defense objected to the severance, and the court denied the severance motion. But it granted the State's request for a five-day extension.

On May 19, 1997, the matter came on for trial. The defendants challenged the jury pool and argued that the process of excusing jurors from the pool had deprived them of an impartial venire. Defendants' counsel complained that delays in providing discovery and last minute witnesses (codefendants) made it impossible for them to properly prepare for trial. The trial court offered a continuance. But the offer was refused.

The court released those defendants who had been incarcerated and set a new trial date for June 16, 1997. The defendants did not object to the June 16, 1997 date.

Of the original 15 defendants, 9 pleaded guilty to various charges, and eventually the remaining 6 went to trial. A

---

[6] The trial court conducted hearings and proceedings on April 30, May 13, May 19, May 20, May 23, June 3, June 11, and June 13.

jury convicted Trujillo, Angel, Thol, and Veth of first degree attempted murder and, in the alternative, of first degree assault. The court entered judgment and sentenced the four on the first degree attempted murder charge only. Kong and Krouch were convicted of first degree assault only and judgment and sentence was entered accordingly.

These same six appeal to this court. We address whether the jury instruction defining accomplice liability given in this case requires reversal of the appellants' convictions and whether the State erred in charging first degree attempted murder and first degree assault in the alternative in the published portion of this opinion. The remaining issues lack precedential value and do not warrant publication.

## ANALYSIS

### I. ACCOMPLICE LIABILITY INSTRUCTION: HARMLESS ERROR

Appellants contend that their convictions must be reversed because the court misinstructed the jury on an element of the offense by giving an instruction declared infirm in *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000). We hold that the court's accomplice liability instruction, if error, was harmless and affirm.

We assume, without deciding, that the reference to *a crime* in the initial paragraph of the accomplice liability instruction given here was erroneous. *See Roberts*, 142 Wn.2d 471; *State v. Cronin*, 142 Wn.2d 568, 14 P.3d 752 (2000).[7] But because the record demonstrates conclusively that such error could not have materially affected the jury's

---

[7] Both the *Roberts* and the *Cronin* opinions set out the text of Instruction number 7 given at their respective trials. The instructions are not identical. The instruction given in *Cronin* was identical to 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51, at 157 (2d ed. 1994) (WPIC 10.51). Under WPIC 10.51 the defendant, knowing that he was facilitating the commission of *a crime*, could be found guilty if the jury found he solicited *the crime* or aided, planned or committed *a crime*. The instruction here is identical to that given in *Roberts*. Here, the jury was required to find that the defendant, knowing that he was facilitating the commission of *a crime* solicited *the crime* or aided, planned or committed *the crime*.

deliberations in this case, we hold that it was harmless beyond a reasonable doubt.

"The complicity rule in Washington is that any person who participates in the commission of the crime is guilty of the crime and is charged as a principal." *State v. Silva-Baltazar*, 125 Wn.2d 472, 480, 886 P.2d 138 (1994). Thus, an information which charges an accused as a principal adequately apprises him or her of potential accomplice liability even though the information does not expressly charge aiding or abetting or refer to other persons. *State v. Davenport*, 100 Wn.2d 757, 764-65, 675 P.2d 1213 (1984); *State v. Rodriguez*, 78 Wn. App. 769, 774, 898 P.2d 871 (1995), *review denied*, 128 Wn.2d 1015 (1996). Aiding and abetting the commission of a crime is not a method or mode of committing that crime, and the elements of the offense remain the same whether the defendant is alleged to have acted as a principal or an accomplice. *State v. Carothers*, 84 Wn.2d 256, 262, 525 P.2d 731 (1974), *cited with approval in State v. Wixon*, 30 Wn. App. 63, 76, 631 P.2d 1033, *review denied*, 96 Wn.2d 1012 (1981).[8] In *Carothers*, our Supreme Court held,

> The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. *The elements of the crime remain the same.*

*Carothers*, 84 Wn.2d at 264 (emphasis added).

After *Carothers*, the legislature enacted the accomplice statute at issue here. "By enacting RCW 9A.08.020(1) and (2)(c), the legislature made more explicit its intent discerned by the court in *State v. Carothers, supra,* which had been based on its interpretation of a predecessor statute, RCW 9.01.030." *State v. Williams*, 28 Wn. App. 209, 213,

---

[8] We note that *Carothers* was disapproved of on other grounds by *State v. Harris*, 102 Wn.2d 148, 685 P.2d 584 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988).

622 P.2d 885, *review denied*, 95 Wn.2d 1024 (1981). In an accomplice liability context, aiding and abetting is neither an element nor a method of committing a crime. *Williams*, 28 Wn. App. at 213. *See also State v. Teaford*, 31 Wn. App. 496, 500, 644 P.2d 136, *review denied*, 97 Wn.2d 1026 (1982) (defendant's status as an accomplice was not an element of either of the principal crimes).

Here, the jury was instructed on the elements of first degree attempted murder as follows:

> To convict the defendant, [named], of the crime of Attempted Murder in the First Degree as charged in cause [number], each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 3rd day of March, 1997, the defendant, or one with whom he was an accomplice, did an act which was a substantial step toward the commission of Murder in the First Degree;
>
> (2) That the act was done with intent to commit Murder in the First Degree;
>
> a) that the act was done with the intent to cause the death of Bun Sean Vath;
>
> and
>
> b) that the intent to cause the death of Bun Sean Vath was premeditated;
>
> and
>
> (3) That the acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (Trujillo) at 377; (Angel) at 340; (Thol) at 325; (Veth) at 424.

A separate definitional instruction defined the term *accomplice*, as used in each of the "to convict" or "elements" instructions, as follows:

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of *a crime*, he or she either:

(1) solicits, commands, encourages, or requests another person to commit *the crime*; or

(2) aids or agrees to aid another person in planning or committing *the crime*.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

Clerk's Papers (Trujillo) at 369 (emphasis added).

■ Misinstructing the jury on an element of an offense has been held to be automatic reversible error. *State v. Smith*, 131 Wn.2d 258, 265, 930 P.2d 917 (1997) (jury instructed on the element of "conspiracy to commit murder" when the proper element was "murder"). *But see Neder v. United States*, 527 U.S. 1, 10, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (omission of an element from a jury instruction is subject to harmless error analysis); *State v. Jennings*, 111 Wn. App. 54, 44 P.3d 1 (2002) (faulty jury instruction regarding display of weapon in robbery trial held to be harmless error). But an error in an instruction that defines a term used in the elements instruction may be harmless and its use is subject to harmless error analysis.[9]

In 1980, our state Supreme Court declared defective a pattern instruction defining the mens rea element of

---

[9] *See, e.g., State v. Handran*, 113 Wn.2d 11, 16, 775 P.2d 453 (1989) (failure to define underlying crime harmless when there is no borderline legal conduct that might be judged criminal); *State v. Brenner*, 53 Wn. App. 367, 378-79, 768 P.2d 509, *review denied*, 112 Wn.2d 1020 (1989) (failure to define "building" harmless error where additional fenced area constituted "building" as a matter of law). *See also State v. Bailey*, 114 Wn.2d 340, 348-49, 787 P.2d 1378 (1990) (absence of nonmarriage element harmless error where indecent liberties victim was three years old).

"knowledge." As a definitional instruction, it was not an element and the Supreme Court applied a harmless error test. *State v. Shipp*, 93 Wn.2d 510, 518, 610 P.2d 1322 (1980), *cited with approval in State v. Wheeler*, 95 Wn.2d 799, 808, 631 P.2d 376 (1981) (inclusion of ambiguous definition of "knowledge" instruction was harmless where jury, by finding act was intentional, found, as a matter of law, that act was knowing).

■■■■■ Assuming, without holding, that the error in the instruction defining accomplice liability is one of constitutional magnitude, we find this record demonstrates that the instruction could not have misled the jury and that it was harmless beyond a reasonable doubt.[10]

Accomplice liability does not necessarily attach to all crimes committed by the principal. "The Legislature . . . intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has 'knowledge' . . . ." *Roberts*, 142 Wn.2d at 511. "[The] individual must have acted with knowledge that he or she was promoting . . . *the* crime for which that individual was eventually charged." *Cronin*, 142 Wn.2d at 579. To hold an individual liable as an accomplice, the State must prove that a person who solicits the commission of *the crime* or aids in the planning or committing of *the* offense necessarily had knowledge of it. The record before us conclusively establishes such knowledge.[11]

Appellants Angel, Thol, Veth, and Kong argue that the faulty accomplice liability instruction relieved the State of

[10] To overcome a general bar to review of an issue first raised on appeal, the court must determine whether the error is one of constitutional magnitude. *State v. Scott*, 110 Wn.2d 682, 684-85, 757 P.2d 492 (1988). An error of constitutional magnitude in a criminal prosecution is harmless if the reviewing court is convinced beyond a reasonable doubt that the evidence not tainted by the error is, by itself, so overwhelming that it necessarily leads to a finding of guilt. *State v. St. Pierre*, 111 Wn.2d 105, 119, 759 P.2d 383 (1988). The State bears the burden of showing a constitutional error was harmless. *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996).

[11] We note also that the State never argued that the appellants could be convicted of the offenses charged if they had knowledge of or participated in a lesser offense.

its burden to prove an essential element of the crime. Trujillo challenges the sufficiency of the evidence proving that he is an accomplice but does not directly challenge the jury instruction. Krouch does not address *Cronin* and *Roberts* in his appeal brief but does raise the same accomplice liability issue.

Review of the record establishes that the instruction defining an accomplice, if error, was harmless beyond a reasonable doubt for all six codefendants, five of whom were principals.[12] From the evidence at trial, any jury would reasonably conclude that Angel, Veth, Thol, Kong, and Trujillo were principals and that their intent was to shoot and kill Vath. Unlike the spontaneous rival gunfight involved in the prosecution of Bui,[13] the defendant in the

---

[12] In addition to the facts set forth above, the record contains the following details concerning the five principals, Angel, Veth, Thol, Kong, and Trujillo:

Angel: Sjoblom heard Angel tell Veth and Thol the plan to "[k]nock on the door and shoot." 1 Report of Proceedings (June 23, 1997) at 21. (This knock and shoot was corroborated by the witnesses to the shooting.) Sjoblom also heard Angel say he would hand the Tec-9 to Veth after he (Angel) was done using it. This is consistent with Veth's possessing the Tec-9 after the shooting and leading the police to where he had hidden the gun after the shooting. Fowler testified that she saw Angel and the others in the bedroom polishing bullets with their shirts to get ready. After the shooting, Angel told Fowler he had shot Vath, "emptied a clip into Sean and he shot him in the head." 3 Report of Proceedings (June 24, 1997) at 309.

Veth: Keo testified that Veth was part of the group that drove from Seattle at the request of Trujillo and Kong. The two said, "[T]hey needed backup . . . . To go shoot somebody." 6 Report of Proceedings (June 19, 1997) at 849. Later Veth led the police to the Tec-9 he hid after receiving it from Angel and using it to shoot at Vath. This matched Sjoblom's testimony that Angel said he would hand the Tec-9 to Veth after he was done using it.

Thol: Davenport transported Thol to the police station after arresting him in the van. During a routine posttransport search of the vehicle, Davenport found "a .45 caliber Sig Sauer magazine, and it had four live .45 caliber rounds, some type of hollow point rounds, loaded into the magazine laying on the floorboard." 6B Report of Proceedings (June 18, 1997) at 745. Five .45 caliber shell casings and four .45 caliber bullet holes were found at Vath's home during the investigation.

Kong: Kong recruited members of Little Ruthless Boyz and Oriental Fantazy Boyz from Seattle for assistance in shooting Vath. Keo not only placed Kong at the scene, but he also testified that Kong assisted Trujillo during the shooting by trying to unjam his gun.

Trujillo: Like Kong, Trujillo went to Seattle to recruit back up and shot (albeit unsuccessfully) at Vath.

[13] Bui and fellow gang members were out cruising in their cars when they encountered the members of a rival gang. As they passed each other, the other

*Cronin* companion case, appellants, here, recruited (or were recruited), organized, planned, and attempted to kill Vath, most believing him to be a rival gang member. All but Krouch were principals and the State was not relieved of its burden to prove any element of the crime beyond a reasonable doubt.

Angel, Thol, and Veth each individually committed all of the required elements of the two crimes charged. They shot at Vath intending to kill him. They committed the assault and, because it was premeditated, the attempted murder. The accomplice liability jury instruction, if error, had no affect on the outcome of their cases.

Trujillo also was a principal in both crimes. Regarding the attempted murder against Vath, he had taken several substantial steps in furtherance of that crime. Trujillo and Kong recruited "shooters" from Seattle on the pretext that this was a gang-related retaliation against the Sorenos. And they transported the recruits and at least one gun from Seattle to Longview for the purpose of shooting Vath. We hold that the presence of the instruction defining accomplice liability did not create reversible error in the jury's verdicts for Trujillo (attempted murder and assault) and Kong (assault). *See* note 14 *infra.*

Moreover, at the scene of the crime, both Trujillo and Kong attempted to unjam Kong's gun so it could fire and they could personally shoot and kill Vath. Contrary to Trujillo's urging at oral argument that there was no evidence in the record that he attempted to shoot Vath, Keo's testimony at trial clearly established that he saw Trujillo trying to shoot Vath and, but for the jammed gun, Trujillo too would have shot Vath.

The factual impossibility of actually hitting Vath with bullets from the jammed gun does not vitiate Trujillo's culpability. RCW 9A.28.020(2) (factual impossibility is not a

gang members "appeared to flash a 'gang sign' " and Bui gave chase. *Cronin*, 142 Wn.2d at 571. According to Bui, at the next intersection, Bui used his car to block the other gang's car, but was caught unaware when passengers in his car then jumped out and fired on the rival gang vehicles, injuring two people.

defense to crime of attempt). Both Trujillo and Kong tried to kill Vath, and the jury's verdict of guilty is not tainted by the challenged accomplice liability jury instruction.

Kong appears to assert that if the State's theory of the case is correct, the group intended to kill Vath and the crime Kong intended to facilitate was "murder" rather than the "assault" with which he was charged. Therefore, he argues, he was convicted for his knowledge and participation in a crime other than that for which he was charged, in violation of *Roberts* and *Cronin*. We do not read the Supreme Court's opinions so broadly. One who knowingly facilitates the commission of a murder necessarily knowingly facilitates the assault required to commit the murder. That the victim refuses to die does not negate a defendant's culpability or mens rea.

Although Krouch was the only nonshooter, nonrecruiter defendant, likewise, the evidence linking him with the plan to shoot Vath was direct, clear, and overwhelming. Although characterizing his actions as driving down with friends to see Kong's new baby, the record establishes that Krouch was recruited from the house in White Center when Kong and Trujillo presented the plan to shoot someone. Keo testified that Krouch knowingly transported gang members in his van from Seattle to Kelso to retaliate against a purported member of a rival gang. After regrouping in Kelso, Krouch drove six others in the van to Vath's house for the shooting. Webb, a neighbor, testified that he saw the van pull up with two other cars without their lights on at 2 A.M. Cooper, another neighbor, testified that he saw the van, again with no lights on, leave after the shooting, circle back (trying to pick up Veth), and then back up to avoid the police. Guns used in the shooting were hidden in Krouch's van's secret compartment.

Krouch is the only nonprincipal codefendant. His guilt on the assault in the first degree charge is derivative of those who shot or attempted to shoot. Thus, to find him guilty of first degree assault, the jury must have found that he was an accomplice. Knowing that his actions would facilitate the commission of *a crime* (murder), he either (1) solicited,

commanded, encouraged, or requested another person to commit *the crime* (first degree assault); or (2) aided or agreed to aid another person in planning or committing *the crime* (first degree assault). The record establishes that Krouch's role was apparently to drive the van. This court can affirm his conviction only if we are assured in our review that the accomplice instruction did not affect the jury's deliberations, that there was overwhelming evidence that Krouch had knowledge of and aided in committing *the crime* with which he was charged (first degree assault), and that the jury convicted Krouch for that crime. We are so assured.

The record establishes that Krouch facilitated the commission of *a crime* (murder) by knowingly driving the shooters and their weapons to Longview with the intention to kill a rival gang member, Vath. The plan did not require that Krouch personally shoot Vath; rather, his part was to remain in the van to provide transportation after the murder was committed. After the shooting, Krouch drove back to the scene to pick up a shooter, Veth, who had been left behind. Krouch abandoned the rescue only when he spotted the police.

The evidence clearly established that Krouch was more than merely present with knowledge that a crime was being committed. He was present and aiding the commission of the crime by providing transportation to and from the crime scene for the principal shooters. That Vath did not die does not relieve Krouch of liability. Error, if any, in the instruction defining accomplice liability was harmless beyond a reasonable doubt.

Finding no reversible error in the accomplice liability instruction, we affirm the attempted murder and first degree assault convictions of Trujillo, Angel, Thol, and Veth and the first degree assault convictions of Kong and Krouch.

## II. The Alternate Charges

### A. Alternatives

The State charged four defendants with first degree assault or, in the alternative, first degree attempted mur-

der.[14] Trujillo claims that because "he was charged in the alternative but tried for both offenses concurrently," his rights to due process and fair notice were violated. Br. of Appellant (Trujillo) at 39. He also argues that it was error for the jury to have been instructed that it could find him guilty of both crimes. In addition, he argues that the judge compounded these allegedly constitutional errors by sentencing him on only the attempted murder charge. Thus, he asserts, the jury produced void verdicts. We disagree.

 "In criminal prosecutions the accused shall have the right to . . . demand the nature and cause of the accusation against him . . . ." WASH. CONST. art. I, § 22 (amend. 10). It has long been the law that "[w]here there are alternate ways to commit a crime it is permissible to charge both alternatives in the same count." *State v. Bowerman*, 115 Wn.2d 794, 800, 802 P.2d 116 (1990) (aggravated premeditated murder and felony murder) (citing *State v. Scott*, 64 Wn.2d 992, 993, 395 P.2d 377 (1964)).

 Recently, recognizing the superior notice provided a defendant by the State's use of such a charging procedure, our Supreme Court expressly approved technically duplicative charges like those in Trujillo's case. *See, e.g., State v. Roberts*, 142 Wn.2d 471, 513-14, 14 P.3d 713 (2000) (premeditated aggravated murder and felony murder). Trujillo had sufficient notice of both charges. We hold that being charged and tried to verdict on the alternative charges did not violate Trujillo's constitutional due process rights.

B. DOUBLE JEOPARDY

 The other basis of Trujillo's argument is a double jeopardy claim. The guaranty against double jeopardy protects a defendant from receiving multiple punishments for the same offense. U.S. CONST. amend. V; *State v. Gocken*, 127 Wn.2d 95, 100, 896 P.2d 1267 (1995). Double jeopardy applies if the multiple punishments cannot survive the

[14] The State attempted to charge Kong similarly, but the trial court disallowed the charge as untimely. The State charged Krouch, the sole defendant left in the van during the shooting, with first degree assault only.

"same elements test." *Gocken*, 127 Wn.2d at 101 (citing *United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993)). The inquiry, commonly known as the *Blockburger* test, applies if the offenses are legally identical and are based on the same act or transaction. *State v. O'Connor*, 87 Wn. App. 119, 123, 940 P.2d 675 (1997); *Kansas v. Hendricks*, 521 U.S. 346, 370, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). The offenses are not constitutionally the same if there is any element in one offense not included in the other and proof of one offense would not necessarily prove the other. *State v. Calle*, 125 Wn.2d 769, 777-78, 888 P.2d 155 (1995) (quoting *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983)).

We note that since briefing and argument in this case, Division One of this court published, per curiam, *State v. Gohl*, 109 Wn. App. 817, 37 P.3d 293 (2001) (holding double jeopardy violated by first degree attempted murder and first degree assault). But in that case, the State conceded that the crimes were based on the same acts and caused the same harm. Here, unlike *Gohl*, different acts arguably support the first degree attempted murder, which was planned over a several hour period, and first degree assault.

More importantly, we observe that the mens rea for first degree attempted murder as charged was premeditation, while the mens rea for first degree assault is an unpremeditated intent to kill. Thus, these two charges are not completely identical. On these facts, the first degree assault is a lesser offense of first degree attempted murder. Whether the shooting was premeditated was an issue to be decided by the jury. Double jeopardy was not violated by charging and trying the offenses at the same time.

But that does not mean that a defendant properly charged and tried to verdict on alternative charges may be sentenced for both. *See State v. Markle*, 118 Wn.2d 424, 437,

823 P.2d 1101 (1992) (prosecutors may charge separate offenses using the same evidence alternatively in the same information); *Calle*, 125 Wn.2d at 773 (quoting *Ball v. United States*, 470 U.S. 856, 864-65, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985)) (concurrent sentencing on multiple convictions for same criminal conduct violates double jeopardy; "the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction"). *Cf. Roberts*, 142 Wn.2d at 534 (court held no error in charging both felony murder and aggravated premeditated first degree murder based on same acts, but reversed one conviction for an erroneous accomplice liability instruction). We agree with *Gohl* that a defendant convicted of alternative charges may be judged and sentenced on one only, and that the verdict on the lesser merges into the greater when the judgment on the greater charge is final and no longer subject to appeal. *See Gohl*, 109 Wn. App. at 824.

Therefore, where the jury returns a verdict of guilty on each alternative charge, the court should enter a judgment on the greater offense only and sentence the defendant on that charge without reference to the verdict on the lesser offense.

Here, the trial court entered judgment on the jury's verdict finding the appellants guilty of attempted murder only and sentenced accordingly. The verdict for first degree assault was not reduced to judgment and does not subject the appellants to any future jeopardy.

The appellants were properly charged and tried in the alternative. And because only the verdict on the attempted murder charge was reduced to judgment, Trujillo, Angel, Thol, and Veth were properly sentenced on the attempted murder charge alone.

Finding no reversible error, we affirm the attempted first degree murder convictions of Trujillo, Angel, Thol, and Veth and the first degree assault convictions of Kong and Krouch. Because the record before this court does not contain Trujillo's judgment and sentence, we remand only

his case to the trial court. If the jury's verdict was reduced to judgment, the trial court should enter an order vacating the assault judgment. The effective date of the trial court's order is the date when the attempted murder charge is no longer appealable.[15]

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MORGAN and BRIDGEWATER, JJ., concur.

Reconsideration denied July 31, 2002.

Review denied at 149 Wn.2d 1002 (2003).

---

[15] The record before this court does not contain Trujillo's judgment and sentence form, only the offender scoring form. (The record does contain the judgment and sentence forms for the other three appellants charged in the alternative.) The scoring form does not indicate that Trujillo was sentenced using the assault as another current offense. However, in an abundance of caution we remand to the trial court to clarify this issue. Thus, if the jury's verdict was reduced to judgment, the trial court should enter an order vacating the assault judgment. The effective date of this order is the date when the attempted murder charge is no longer appealable.