IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77117-5-I |
| | ) | |
| Respondent/Cross-Appellant, | ) | DIVISION ONE |
| | ) | |
| | ) | PUBLISHED OPINION |
| v. | ) | |
| | ) | |
| GEORGE DONALD HATT, JR., | ) | |
| | ) | |
| Appellant/Cross-Respondent. | ) | |
| | ) | |
| | ) | FILED: November 18, 2019 |

HAZELRIGG-HERNANDEZ, J. — George Donald Hatt, Jr., seeks reversal of his convictions for first degree murder, unlawful possession of a firearm in the second degree, possession of an unlawful firearm, and evidence tampering. He contends that the State failed to disprove his claim of self-defense and that the trial court erred in giving an aggressor instruction, denying a motion to suppress evidence obtained during the execution of a search warrant, concluding that the two firearm counts were not part of the same criminal conduct, and imposing a criminal filing fee on an indigent defendant. In a statement of additional grounds for review, Hatt argues that the State failed to preserve allegedly exculpatory evidence and the court failed to protect his constitutional right to a speedy trial. We conclude that the court employed the incorrect analysis when determining whether the firearms counts were part of the same criminal conduct for purposes of offender score

calculation and sentenced Hatt based on an incorrect offender score. Because of this error and because the parties do not dispute that the filing fee should be stricken, we remand for resentencing. Hatt's convictions are affirmed.

FACTS

In 2015, George D. Hatt, Jr. (Hatt), lived on a property in Granite Falls with his girlfriend, Lea Espy. Several other people lived on the property in various trailers and motor homes, including Jared Fincher, Shannon Sycks, and Mitch Stamey.

Hatt's house was burglarized in the spring of 2015, and he believed that Andrew Spencer was responsible. Multiple witnesses heard Hatt say that he wanted to kill Spencer in retaliation for the burglary. Stamey heard Hatt say ten or more times that he was "going to get [Spencer] back." Hatt denied saying that he wanted to kill Spencer. He admitted to saying he was going to "get" Spencer, but testified that his intention was to make Spencer face him and confess to what he had done.

On Halloween 2015, Spencer came to the Granite Falls property. Hatt assumed there was going to be a confrontation when he saw Spencer arrive. However, Hatt testified that Spencer wanted to resolve the issues between them because he had "two violent felonies, and one more strike and he'll do life." Other residents on the property confirmed that the two were discussing the burglary and seemed to be on good terms. After they talked, Hatt was confident that they had resolved the issue.

-2-

In early November 2015, Andrew Spencer drove to the property with his friend Kindall Lowenberg in the passenger seat of his car. While they were driving to the property, Spencer asked Lowenberg how she dealt with confrontation. Stamey was leaving the property at about the same time and encountered Spencer on the road. Spencer and Stamey spoke through the windows of their vehicles. Stamey then called Espy's phone to alert Hatt that Spencer was on his way. Hatt and Espy were in the upstairs living area of the main house. Fincher was working on a car outside the main house. After Stamey's call, Hatt yelled out the window of the house to Fincher, "Andrew's here."

When Spencer arrived, he got out of his car and walked over to Fincher. Spencer had his left hand concealed in the pocket of his hoodie. Fincher extended his right hand to shake hands with Spencer because he thought they were on good terms. Spencer grabbed his outstretched hand, pulled Fincher toward him, and punched him in the face with his left fist. Spencer did not have a gun or a weapon of any kind, but Fincher suspected he might have had something in his left fist because of how hard he hit.

Fincher fell to the ground, and Spencer hit and kicked him about six more times. Then Spencer said, "Now that you're warmed up, we can talk." At about the same time that Spencer made that comment, Fincher heard the sounds of Hatt running down the exterior staircase that led to the second floor of the main house and cocking a gun. Hatt fired two shots, one of which hit Spencer in the head and killed him. When he heard the shots, Fincher curled up on the ground for cover. Fincher was scared that he would also be shot because Hatt had told him in the

past, "Jared, if you're ever here and Andrew shows up, you get the hell out of here, because I have to kill you too because I can't have witnesses."

When Fincher looked up, he saw that Spencer was dead and saw Hatt walking to Spencer's car. Hatt told Fincher to clean himself up; Fincher was bleeding from his lip and hands. Fincher went into the house to put on a clean shirt because his was covered in blood. Hatt sat down in the driver's seat of Spencer's car and begin talking to Lowenberg, who was still sitting in the passenger seat. Hatt was still holding the gun when he got into the car. He locked the car doors and asked Lowenberg if she needed any money. Hatt told her not to tell anyone what had happened that night. As Fincher emerged from the house, he saw Hatt getting out of Spencer's car. Lowenberg heard Hatt say to Fincher, "I asked you if you want me to do this. I'm not going down for this alone."

Hatt told Fincher to cover the body, and Fincher covered it with a tarp. Hatt told Hoy, who had been asleep in Fincher's trailer until she heard the gunshot, to ride with Espy and take Lowenberg home. As she walked to the car, Hoy noticed a person on the ground covered with a tarp. She got into Hatt's sport utility vehicle (SUV) with Espy and Lowenberg, and Espy drove Lowenberg home.

Hatt began digging a hole in a fire pit on the property and instructed Fincher to help him drag Spencer's body to the hole. They put the body in the hole bent over at the waist. Hatt remarked that Spencer would "forever be known as kissing his own ass." He jumped up and down on Spencer's back five or six times before starting to shovel dirt onto his body. Hatt instructed Fincher to "grab a shovel and give [him] a hand." He then grabbed a dumbbell and threw it on the body a few

times. After the two of them buried Spencer's body, Hatt lit a large fire in the fire pit. Fincher saw Hatt pouring liquid from a one-gallon jug into the fire pit. Hatt told Fincher not to breathe the smoke because he was putting acid on the fire.

When Espy and Hoy returned to the property about 45 minutes after leaving, there was a fire burning in the fire pit. Hoy heard Hatt tell Espy that he was sorry for putting her in that situation but something had to be done. She heard him say he had shot Spencer for robbing his house. The fire in the fire pit burned for three days.

Fincher eventually informed the Snohomish County Sheriff's Office of what had happened. Detectives obtained a search warrant for the property and discovered Spencer's body in the fire pit.

The medical examiner, Dr. Daniel Selove, recovered a bullet from Spencer's head and determined that he had been killed by a shot to the forehead. Dr. Selove also noted what appeared to be a bullet hole in the right upper arm or shoulder area of Spencer's clothing and another in the right upper back of the garments. Due to the accelerated decomposition of Spencer's body caused by the fire, Dr. Selove was not able to identify a bullet hole in the skin of the right shoulder. He could not identify a bullet wound from the bones or remaining tissue in that location. He did identify a slit injury about half an inch or smaller on Spencer's front right shoulder. Dr. Selove noted that this was not characteristic of a gunshot entrance wound, although gunshot exit wounds sometimes appear as slits. He could not say what caused the wound or whether it occurred postmortem or while Spencer was dying. X ray images of Spencer's chest showed a sliver of metal in his chest,

"not sufficiently large or of the shape to say that it is a bullet but suggestive that a bullet left a fragment somewhere in the—in the chest/trunk part of the body."

Hatt was charged with first degree murder (firearm allegation), second degree murder (firearm allegation), unlawful possession of a firearm in the second degree, possession of an unlawful firearm, intimidating a witness (firearm allegation), and two counts of tampering with physical evidence. At trial, Hatt argued that he had acted in self-defense and defense of another.

Hatt testified that he was familiar with Spencer's reputation in the community and his reputation was that "[h]e wasn't anybody to mess with." He described a number of confrontations that he or other members of the community had had with Spencer, including an incident in May 2015 when Spencer punched Hatt at a gas station. Hatt left town that night, and when he returned, his house had been burglarized and vandalized. A picture was torn off the wall and there was a swastika drawn on the wall and writing that said, "go home, Jew." Hatt did not know who had vandalized the house but came to believe that it was Spencer when Spencer yelled at him about a month later, "I thought I told you to leave, Jew." He encountered Spencer at another gas station and asked him if he would come out to the property to talk. Spencer responded, "Well, I'll be out at your property sometime. You just won't know when." Hatt took this as a threat. He heard from someone else that Spencer was "waiting to bury" him if he went to Spencer's house.

When Spencer came to the property on Halloween, he indicated to Hatt that he was there to work out the issue of the burglary. Hatt said no one was on the

property when Spencer arrived, although Stamey and Sycks pulled up less than an hour later. As he was leaving, Spencer asked if a trailer on the property was Fincher's. Spencer mentioned something about Fincher being a snitch. Hatt said he and Spencer shook hands, but he asked Spencer not to return to the property.

Hatt testified that he was worried and scared when Stamey called to tell him Spencer was coming to the property. From what he knew of Spencer, Hatt believed he would be armed. Hatt opened the window to tell Fincher that Spencer was coming and saw Spencer getting out of his car. He saw Spencer approach Fincher with his left hand in the pocket of his hoodie. Fincher and Spencer looked like they were about to shake hands, but Spencer pulled Fincher toward him and hit him with his left hand. Hatt testified that he thought Spencer had a gun in his left hand and had pistol-whipped Fincher. He saw Fincher go down and went to his safe to retrieve a gun. Hatt turned on the television that showed a live feed from the outside security cameras. On the screen, he could see Fincher scrambling on his hands and knees toward the stairwell while Spencer continued to punch and kick him.

Hatt ran out the door to the exterior stairwell and saw Spencer kick Fincher in the side while Fincher was on the ground. He saw a lot of blood on Fincher. Hatt still thought Spencer had a gun in his left hand that was aimed down, so he started yelling, "Hey, hey, hey, hey, hey," as he came down the stairs. Spencer turned toward Hatt, and Hatt fired a shot in the air. Hatt testified that Spencer got an angry look on his face, took a step toward him, and seemed to be raising his left hand. Hatt fired a second shot at Spencer. After Spencer went down, Hatt

moved to kick the gun out of his hand and realized that Spencer had a black glove on his left hand and was holding a black metal bar about one inch in diameter and four to six inches long. Hatt testified that he was not thinking of the burglary when he shot Spencer and had assumed the two of them had resolved their issues when they talked on Halloween. Hatt asked Fincher if he was all right and said Fincher seemed "punchdrunk."

After Espy and Hoy left to drive Lowenberg home, Hatt said he did not consider calling the police because he was afraid that he would go jail. He also said he was worried about retaliation from Spencer's family or associates. Hatt confirmed that he believed Spencer had burglarized his house in the spring of 2015 and stolen around $40,000 worth of property.

Hatt proposed a jury instruction explaining that homicide is justifiable when committed in lawful defense of the slayer or another in the slayer's presence. The trial court gave the proposed instruction and also instructed the jury that self-defense is not available as a defense when the defendant's actions provoked or commenced the confrontation with the victim.

The jury found Hatt guilty of murder in the first degree, unlawful possession of a firearm in the second degree, possession of an unlawful firearm, and one count of tampering with physical evidence. The jury found him not guilty of the second count of tampering with physical evidence. The jury also found that he was armed with a firearm at the time he committed the murder. Hatt was sentenced to a total term of confinement of 434 months. The court imposed a $200 criminal filing fee as part of the judgment and sentence. Hatt timely appealed.

DISCUSSION

I.    Suppression of Evidence

Hatt contends that the trial court erred in denying his motion to suppress evidence procured while sheriff's deputies executed a search warrant. He argues that the warrant was not constrained by sufficient particularity and the deputies exceeded the scope of the warrant. He specifically assigns error to three of the trial court's findings of fact and one conclusion of law.

We review de novo a trial court's conclusions of law relating to suppression of evidence. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). Appellate courts review findings of fact for substantial evidence. Id. "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Unchallenged findings of fact become verities on appeal. State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

A.    Findings of Fact

Hatt contends that the court erred in entering three findings of fact that characterized the deputies' actions at the property as "processing" the fire pit. He argues that the word "processing" "implies mere routine handling of matters and material within the warrant's authority," but does not apply to this situation, where officers "dug into the ground on real property . . . and searched for a body." The State defines "process" as "subject to examination through a series of steps." To "process" may also mean "to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result."

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1808 (3d ed. 2002). To "search" means "to look into or over carefully or thoroughly in an effort to find something." Id. at 2048.

The unchallenged findings of fact are treated as verities on appeal. The trial court found that the Snohomish County Sheriff's Office obtained a warrant to search the property where Hatt resided after Fincher told officers that Hatt had killed Spencer and buried him on the property. Detectives searched the property and found what they believed might be skin and dark hair in the fire pit. They then found what appeared to be a rib bone in the fire pit. Doctors from the Snohomish County Medical Examiner's Office arrived at the property and exhumed Spencer's body from the fire pit. There is sufficient evidence in the record to persuade a fair-minded, rational person that the detectives examined the fire pit through a series of steps or looked into it thoroughly in an effort to reveal evidence. Regardless of any connotation, the court did not err in finding that the detectives were "processing" the fire pit.

B.    Conclusion of Law

Hatt next contends that the court erred in concluding that the search of the fire pit was permissible. The trial court's first conclusion of law stated: "The sheriff's office did not exceed the scope of the warrant. The warrant did permit the sheriffs to dig through the fire pit. The fire pit was an 'item' that could be searched. There was nothing in the warrant that precluded the police from digging in the fire pit." Hatt argues that the officers executing the warrant exceeded the scope of the

warrant when they disturbed the soil in the fire pit because the warrant did not state this place to be searched with particularity.

The warrant authorizes the search of the .083-acre property where Hatt resided, which contained "a single family residence and numerous detached sheds, outbuildings and various operable and apparently inoperable recreation vehicles or like items used by 'squatters.'" Officers were instructed to seize, among other things:

Any and all firearms in their various forms . . .

All ammunition, bullets, bb's, pellets or cartridges both fired and unfired which is identified as a projectile whose purpose is to be fired from a firearm or similarly styled item . . .

Trace evidence to include: blood, skin, fingerprints, tissue or other biological material located for the collection and comparison to the victim and/or suspect and ANY items containing the same.

. . .

Rags, clothes, towels, containers and/or like items commonly utilized to clean, conceal, destroy or otherwise alter blood, tissue or other biological material or items such as lye, lime, acids or other chemicals or items of similar substance and their respective containers. Digging equipment or other tools which could be used to disturb soil, excavate soil or disrupt soil or vegetation.

The warrant specified that "[t]he authorization extends to all locked, sealed or otherwise located items that may require damaging in order to gain access."

1.    Particularity

Hatt argues that the warrant was invalid in its entirety because it did not meet the particularity requirement of the Fourth Amendment. We review de novo whether a warrant is sufficiently particular to satisfy the demands of the Constitution. State v. Perrone, 119 Wn.2d 538, 549, 834 P.2d 611 (1992).

The Fourth Amendment requires that warrants describe with particularity the places to be searched and the persons or things to be seized. U.S. Const. amend. IV. This requirement is intended to prevent general searches, "seizures of objects on the mistaken assumption that they fall within the issuing magistrate's authorization," and "the issuance of warrants on loose, vague, or doubtful bases of fact." Id. at 545. The court interprets search warrants "in a commonsense, practical manner, rather than in a hypertechnical sense." Id. at 549.

a.      Place to be Searched

A warrant adequately describes a place to be searched when "the officer executing the warrant can, with reasonable care, identify the place intended." State v. Cockrell, 102 Wn.2d 561, 570–71, 689 P.2d 32 (1984). A street address or legal description of the property is sufficient to identify the place to be searched. See id. at 569. In one instance, we upheld a warrant authorizing a search of 60 acres of real property. See State v. Christiansen, 40 Wn. App. 249, 251, 253, 698 P.2d 1059 (1985). "A warrant to search a specific tract of real property necessarily authorizes a search of parts of that property." Id. at 253–54.

In this case, the warrant specified the correct street address of the .083-acre property where Hatt lived as the property to be searched. Officers executing the warrant were able to identify the property. Because a warrant for the search of real property authorizes a search of parts of the property and the fire pit was part of the property, the fire pit was included in the place to be searched and did not need to be separately designated. The warrant described the place to be searched with adequate particularity.

b.      Items to be Seized

We next consider whether the warrant described the items to be seized with adequate particularity. Hatt's chief objection to the language of the warrant seems to be that the warrant authorized a search for "trace evidence" of biological material rather than an entire body.

A search warrant must be "sufficiently definite so that the officer executing the warrant can identify the property sought with reasonable certainty." State v. Stenson, 132 Wn.2d 668, 692, 940 P.2d 1239 (1997). A description of items to be seized is sufficient if it is "as specific as the circumstances and the nature of the activity under investigation permit." Perrone, 119 Wn.2d at 547. Generic descriptions may be sufficient if probable cause is shown and a more precise identification cannot be determined at the time the warrant is issued. Id. A showing of probable cause requires reasonable grounds for suspicion that the accused committed the indicated crime from the facts in the affidavit and reasonable inferences therefrom. State v. Clark, 143 Wn.2d 731, 748, 24 P.3d 1006 (2001). In Clark, the Supreme Court found that a warrant for "trace evidence from the victim in the van" satisfied the particularity requirement of the Fourth Amendment. Id. at 754 (emphasis omitted).

The affidavit stated that Fincher saw Hatt digging in the fire pit and Hatt told Fincher he would handle the disposal of Spencer's body. Fincher stated that Hatt started a fire in the fire pit that burned actively for two or three days. On the second day that the fire was burning, Fincher saw Hatt pour liquids into the fire pit, which Hatt identified as "lye, lime, and acid." When a detective observed the fire pit a

few days later, he noticed that "the soil in the area of the fire pit appeared freshly disrupted and it contained debris that was consistent with a recent fire having burned in the pit area." The detective did not note seeing a body in the fire pit.

Based on the information available to the sheriff's office when it applied for the search warrant, the description of "trace evidence" of biological material was sufficient to satisfy the particularity requirement. The affidavit established probable cause, and a more precise description of the biological material was not available at the time the warrant issued. It would have been reasonable to assume that trace evidence might be all that remained of Spencer's body after it was burned for two to three days and doused with corrosive chemicals. The descriptions given of the biological and physical evidence to be seized allowed the officers executing the warrant to identify the material to be seized with reasonable certainty.

c.  Suspected Crimes

In a statement of additional grounds for review, Hatt also contends that the warrant was overbroad because it did not specify the subsections of the statutes governing the suspected crimes. The warrant stated that there was "probable cause to believe that the crime(s) of: RCW 9A.32.030 Murder in the First Degree, RCW 9A.32.050 Murder in the Second Degree, RCW 9.41.040 Unlawful Possession of a Firearm Second Degree" had been committed and that evidence of those crimes could be found at the property. (emphasis omitted)

In State of Washington v. Joseph N. Riley, the Washington Supreme Court found that a warrant that did not list any specific crime, but authorized the seizure of "any fruits, instrumentalities and/or evidence of a crime" and specified only broad

categories of material, was overbroad and invalid. 121 Wn.2d 22, 26, 28, 846 P.2d 1365 (1993). The court held that "[a] search warrant that fails to specify the crime under investigation without otherwise limiting the items that may be seized violates the particularity requirement of the Fourth Amendment." Id. at 27. In State of Washington v. Lloyd J. Higgins, Division Two of this court found that a warrant was overbroad when it "did not contain a list of items to be seized, did not incorporate the affidavit [listing specific items to be seized] by reference, and did not list a subsection of the second degree assault statute." 136 Wn. App. 87, 90, 94, 147 P.3d 649 (2006).

Here, although the warrant did not specify the specific subsections of the statutes, it was clear which crimes were under investigation. Additionally, as discussed above, the warrant included a detailed list of the items to be seized, which were logically related to the specified crimes. The warrant was not overbroad.

### 2. Scope

Hatt contends that the officers executing the warrant exceeded the permissible scope of the warrant when they moved and sifted through the dirt and debris in the fire pit. As we concluded above, because the warrant authorized the search of the entire property and the fire pit was on that property, the fire pit was within the scope of the warrant.

Having concluded that the fire pit was permitted to be searched under the warrant, the next issue is whether moving and sifting through dirt and debris in the fire pit was a permissible way to search the fire pit. The warrant did not specifically

authorize, nor did the affidavit request, any specific method of searching the property. Officers were authorized to seize "[d]igging equipment or other tools which could be used to disturb soil, excavate soil, or disrupt soil or vegetation." The warrant also authorized the search of any locked or sealed items that required damaging to access the contents.

Reading the warrant in a common-sense manner, it is sufficiently clear that the officers executing the warrant would understand that, because they were authorized to seize digging equipment, they should pay particular attention to and search areas of the property that appeared to have been dug into. Although the fire pit was not locked or sealed, the disruption of the dirt and debris in the fire pit is analogous to damaging an item to access evidence inside. The officers permissibly searched the fire pit when they moved and sifted through the dirt and debris.

Hatt also appears to argue that the officers exceeded the scope of the search warrant when they seized Spencer's body because the warrant only authorized the seizure of "trace evidence" of biological material. This argument is not well taken. The warrant directed the officers to search the property for evidence of murder and specified that they were authorized to seize biological material of the victim. "Officers with a proper search warrant for premises have the right to seize any contraband which they discover while conducting a search within the scope of the warrant." State v. Burleson, 18 Wn. App. 233, 239, 566 P.2d 1277 (1977). Finding more evidence than expected does not exceed the

scope of the search warrant. The court did not err in denying the motion to suppress.

## II.    Aggressor Instruction

Hatt contends that the court erred in instructing the jury that self-defense was not available as a defense if the defendant initiated the confrontation because the State did not present sufficient evidence to warrant the instruction. The State argues that the aggressor instruction was an accurate statement of the law and that there was sufficient evidence that Hatt initiated the confrontation to justify the instruction.

Jury instructions are sufficient when they "are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law." State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). We review alleged instructional errors de novo, in the context of the instructions as a whole. State v. Brett, 126 Wn.2d 136, 171, 892 P.2d 29 (1995).

A killing is justified when the slayer has a reasonable apprehension that the victim is imminently going to cause great personal injury to the slayer or another person in the slayer's presence. RCW 9A.16.050. A defendant has the burden to produce some evidence that he acted in self-defense or defense of another before the court will instruct the jury on justifiable homicide. State v. Janes, 121 Wn.2d 220, 237, 850 P.2d 495 (1993). When a defendant makes a threshold showing that the killing was justified, the jury instructions must make the law of self-defense or defense of another "'manifestly apparent to the average juror.'" State v. LeFaber,

128 Wn.2d 896, 900, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 217 P.3d 756 (2009), (quoting State v. Allery, 101 Wn.2d 591, 595, 682 P.2d 312 (1984)).

Generally, a slayer may not claim self-defense to justify a killing when they were the aggressor or provoked the confrontation. State v. Craig, 82 Wn.2d 777, 783, 514 P.2d 151 (1973). The court may appropriately give an aggressor instruction when "there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). If there is conflicting evidence about whether the defendant provoked the altercation, the aggressor instruction is appropriate. Id. at 910. However, "courts should use care in giving an aggressor instruction" because the instruction can affect the State's burden to disprove a claim of self-defense beyond a reasonable doubt. Id. at 910 n.2. For this reason, we have noted that an aggressor instruction is warranted only in few situations and that the parties can sufficiently argue their theories of the case without the instruction. State v. Stark, 158 Wn. App. 952, 960, 244 P.3d 433 (2010).

In the recent case of State of Washington v. Michael Espinosa, we considered the inclusion of an aggressor instruction in a similar factual scenario. 8 Wn. App. 2d 353, 438 P.3d 582 (2019). In Espinosa, the defendant fired two shots, the second of which killed the victim. Id. at 356. Espinosa testified that the first shot was a warning shot intended to prevent the victim from attacking another person and the second shot was fired in self-defense when the victim turned and began advancing on him. Id. at 357. The defendant requested that the court

instruct the jury on both self-defense and defense of another, and the State requested that the court give an aggressor instruction. Id. at 357–58. The court elected to give the self-defense instruction and the aggressor instruction, but not the defense of another instruction. Id. at 358. In closing argument, the State urged the jury to consider only the conflict between Espinosa and the victim when evaluating whether Espinosa was the aggressor. Id. at 359.

In that case, we found that it was error to give the self-defense and aggressor instructions without the defense of another instruction because the instructions as given failed to make the law of self-defense manifestly clear to the jury. Id. at 361. The exclusion of the defense of another instruction in conjunction with the State's closing argument, which "removed the warning shot from the greater context of the situation," impaired the jury's ability to assess whether the warning shot was a reasonable use of force or an act of aggression. Id. at 363.

Here, the court found that Hatt had produced sufficient evidence to warrant an instruction on both self-defense and defense of another. The court seemed to believe that it was required to give the aggressor instruction if it gave the self-defense instruction. The State agreed that if the court gave the self-defense instruction, the aggressor instruction would also be permissible. The court concluded that "[it could not] see how giving a self-defense instruction [it] wouldn't be obliged also to give the first aggressor instruction."

It follows from our statement that "[t]he theories of the case can be sufficiently argued and understood by the jury without such instruction" that a trial court is not required to give an aggressor instruction. Stark, 158 Wn. App. at 960

(quoting State v. Arthur, 42 Wn. App. 120, 125 n.1, 708 P.2d 1230 (1985)). But, although the court was under no obligation to give the aggressor instruction, it was not error to give the instruction. There was conflicting evidence presented at trial about whether Hatt initiated the altercation with Spencer. Hatt was not present outside when Spencer began hitting Fincher. Fincher's testimony suggested that Spencer's assault had stopped by the time Hatt came outside. Fincher did not hear Hatt yelling as he came down the stairs, but heard the gun being cocked and remembered the two shots being fired in quick succession. Hatt testified that the first shot was a warning shot to get Spencer's attention and intimidate him. He stated that he did not fire the second shot until Spencer turned toward him and Hatt thought he was raising a gun toward him. Under Hatt's theory, he fired the first shot in defense of Fincher and the second in defense of himself. Under the State's theory, the altercation between Spencer and Fincher had ended by the time Hatt fired the gun and Hatt provoked any need to act in self-defense.

Unlike Espinosa, the court in this case instructed the jury on both self-defense and defense of another, which presented the jury with a complete picture of the relevant law. The jury could have credited both Fincher's testimony that the fight was over and Hatt's testimony that Spencer turned toward him after the first shot and he feared for his life, in which case the jury could have concluded that he provoked the need to act in self-defense. The trial court did not err in giving the aggressor instruction.

III.    Sufficiency of Evidence

Hatt contends that the State did not produce sufficient evidence to disprove beyond a reasonable doubt his claim of self-defense as a defense to the charge of murder.  When reviewing the sufficiency of evidence on appeal, the key inquiry is whether any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the State. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). When a defendant challenges the sufficiency of the evidence, he admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The State presented testimony from multiple witnesses about the relationship between Hatt and Spencer in the months leading up to his death, the events of the night Spencer was killed, and the forensic examination of Spencer's body.  Viewing the evidence produced at trial in the light most favorable to the State, a rational trier of fact could find that the State disproved Hatt's claim of self-defense beyond a reasonable doubt.  Multiple witnesses testified that Hatt had talked about killing Spencer in retaliation for robbing him.  The State produced evidence that he came out of the house and fired two shots in quick succession. Spencer was not armed with a gun or knife.  A rational trier of fact could find that Hatt did not have a reasonable apprehension that Spencer was about to cause great personal injury to him.  The evidence was sufficient to disprove Hatt's claim of self-defense beyond a reasonable doubt.

IV.     Same Criminal Conduct

Hatt contends that the trial court erred in finding that the charges of possession of an unlawful firearm and unlawful possession of a firearm did not constitute the same criminal conduct. He argues that, because of this error, the court sentenced him based on a miscalculated offender score.

We review the trial court's determination of same criminal conduct for abuse of discretion or misapplication of the law. State v. Tili, 139 Wn.2d 107, 122, 985 P.2d 365 (1999). For the purpose of calculating an offender score, when the court finds that multiple offenses in the current case encompass the same criminal conduct, those offenses are counted as a single crime. RCW 9.94A.589(1)(a). The statute defines "same criminal conduct" to mean "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." Id. The sentences imposed for crimes that encompass the same criminal conduct are to run concurrently. RCW 9.94A.589(1)(a).

A claim that the trial court erred in determining whether two crimes constituted the same criminal conduct differs from a double jeopardy violation claim. State v. French, 157 Wn.2d 593, 611, 141 P.3d 54 (2006). "The double jeopardy violation focuses on the allowable unit of prosecution and involves the charging and trial stages[, while t]he 'same criminal conduct' claim involves the sentencing phase." Id.

In Hatt's sentencing memorandum, he argued that the two current offenses should count as one point toward his offender score as follows:

> Mr. Hatt was found guilty of Unlawful Possession of a Firearm
> (UPF) as well as Possession of an Unlawful Firearm (PUF) for

possessing the same weapon. The principle of double jeopardy prevents a person from being "twice put in jeopardy for the same offense." Wash. Const. art. I, § 9. The prohibition on double jeopardy generally means that a person cannot receive multiple punishments for the same offense. Dep't of Revenue v. Kurth Ranch, 511 U.S. 767, 769 n.1, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994). To determine whether Double Jeopardy has been violated, we must look to the act or course of conduct. State v. Villanueva-Gonzalez, 180 Wn.2d 975, 981–82 (2014).

Here, Mr. Hatt possessed one weapon which, according to the jury, met the criteria for both UPF and PUF. It is the same course of conduct and should only be counted as one point towards Mr. Hatt's [offender score].

Although Hatt invoked the specter of double jeopardy, his argument ultimately concerned calculation of the offender score rather than the entry of the convictions. The State argued in a supplemental sentencing memorandum that the two crimes did not constitute the same criminal conduct because the mens rea differed.

At the sentencing hearing, the State addressed Hatt's "argument regarding jeopardy, merger, or same criminal conduct." The State reiterated that the two crimes were not the same criminal conduct because they contained different knowledge requirements. Hatt argued briefly that the two offenses should only count as one point toward his offender score because they were two different charges based on the same act of possessing the gun. He clarified that he was not arguing that the offenses merged or were the same offense.

The court announced its analysis and ruling as follows:

I think the case that speaks to this most directly is State vs. Walker, 143 Wn. App. 880.[1] The Walker case does demonstrate that the Blockburger[2] Test still applies for purposes of same criminal conduct and determining whether or not two offenses should count as a single point.

---

[1] State v. Walker, 143 Wn. App. 880, 181 P.3d 31 (2008).
[2] Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

- 23 -

And according to the <u>Blockburger</u> Test, the question is whether each contains an element the other does not. And in this case, each does contain an element that the other does not and, therefore, fails the <u>Blockburger</u> Test. And each of these is a separate crime for scoring purposes because it is clear that the legislature intended to punish both crimes separately. This is not specifically an application of the merger doctrine, this is just a matter of same criminal conduct, and they are not same criminal conduct. Each one counts as a separate felony.

Because it counted each crime as a separate felony for purposes of the offender score calculation, the court sentenced Hatt based on an offender score of four.

In <u>Walker</u>, Division Two of this court analyzed 1) whether the entry of convictions for both first degree theft and first degree trafficking in stolen property placed Walker in double jeopardy, and 2) whether Walker was denied effective assistance of counsel when his counsel failed to argue that the two convictions constituted the same criminal conduct for purposes of calculating his offender score. 143 Wn. App. at 886. The <u>Walker</u> court applied the <u>Blockburger</u> "same elements" test and the <u>State v. Reiff</u>, 14 Wash. 664, 667, 45 P. 318 (1896), "same evidence" test to analyze the double jeopardy issue. <u>Id.</u> at 885–86. The court analyzed the same criminal conduct issue using the framework described in RCW 9.94A.589(1)(a). <u>Id.</u> at 890.

In this case, the trial court analyzed the same criminal conduct issue using the test for a double jeopardy violation. Because the court misapplied the law, it abused its discretion.

The Supreme Court has remarked that "[d]eciding whether crimes involve the same time, place, and victim often involves determinations of fact." <u>State v. Chenoweth</u>, 185 Wn.2d 218, 220, 370 P.3d 6 (2016). However, when the

underlying facts are undisputed, the determination of same criminal conduct may be resolved as a matter of law. See State v. Graciano, 176 Wn.2d 531, 537 n.1, 295 P.3d 219 (2013). The parties agreed at oral argument that the question of whether two crimes constitute the same criminal conduct for purposes of Hatt's offender score calculation is a legal issue that we may decide on appeal. We elect to do so.

To determine whether Hatt's convictions for unlawful possession of a firearm and possession of an unlawful firearm stemmed from the same criminal conduct, we must determine whether they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). All three prongs must be present to support a finding that the offenses constituted the same criminal conduct. State v. Porter, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). The defendant bears the burden to establish each element of same criminal conduct under RCW 9.94A.589(1)(a). Graciano, 176 Wn.2d at 540–41. "[T]he statute is generally construed narrowly to disallow most claims that multiple offenses constitute the same criminal act." Porter, 133 Wn.2d at 181.

Both charges stemmed from Hatt's possession of the firearm on the night that Spencer was shot, so the criminal conduct supporting each charge occurred at the same time and place. The Supreme Court has held that the victim of unlawful possession of a firearm is the general public. State v. Haddock, 141 Wn.2d 103, 110–11, 3 P.3d 733, 736 (2000). In so holding, the court analogized the offense to unlawful possession of a controlled substance. Id. at 111. By this

same logic, possession of an unlawful firearm also victimizes the general public. Accordingly, the victim of the two crimes was the same.

Finally, we must consider whether the two crimes involved the same criminal intent. The Washington Supreme Court first interpreted the elements of the same criminal conduct test in State of Washington v. James T. Dunaway. 109 Wn.2d 207, 743 P.2d 1237 (1987). Although the statutory analysis for same criminal conduct was adopted after the offenses in Dunaway were committed, that opinion indicated that "the standard for 'same criminal conduct' we have adopted today is similar to a recently enacted legislative definition of the same term." Id. at 215 (citing former RCW 9.94A.400(1)(a) (1987), recodified as RCW 9.94A.589(1)(a)). The court later characterized the common law test for same criminal conduct set out in Dunaway as "entirely consistent with the statutory test set out in [former RCW 9.94A.400(1)(a)]." State v. Lessley, 118 Wn.2d 773, 777–78, 827 P.2d 996 (1992).

In analyzing the third factor, Dunaway directed courts to "focus on the extent to which the criminal intent, as objectively viewed, changed from one crime to the next." Dunaway, 109 Wn.2d at 215. The Supreme Court did not interpret objective criminal intent to be equivalent to statutory intent, stating that "counts with identical mental elements, if committed for different purposes, would not be considered the 'same criminal conduct.'" Haddock, 141 Wn.2d at 113. Washington courts applied this test consistently for nearly 30 years. See, e.g., State v. Garza-Villarreal, 123 Wn.2d 42, 49, 864 P.2d 1378 (1993) ("[T]he crimes, objectively viewed, furthered one overall criminal purpose."); Haddock, 141 Wn.2d at 113 ("Haddock's single

intent to possess stolen property motivated the conduct underlying all seven convictions. In sum, his criminal intent, objectively viewed, did not change from one crime to the next."); Graciano, 176 Wn.2d at 540–41 ("[W]e do not need to reach the comparatively more difficult question of whether Graciano's objective intent changed from one crime to the other . . .")

However, in 2016, the Washington Supreme Court departed from this analysis when analyzing whether rape of a child and incest constituted the same criminal conduct. Chenoweth, 185 Wn.2d 218 (2016). In State of Washington v. Chad C. Chenoweth, the court compared the statutory criminal intent requirements of the two crimes to determine that "[t]he intent to have sex with someone related to you differs from the intent to have sex with a child." Id. at 223. However, because the Supreme Court did not overrule, or even discuss, the line of case law applying the Dunaway test and has not applied the Chenoweth analysis outside of the context of those particular crimes, we believe Dunaway remains the applicable framework.

Although Hatt's possession of the weapon was unlawful for two separate reasons, his objective criminal intent in committing the two crimes was the same: to possess the firearm. Because the two crimes were committed at the same time and place, against the same victim, and with the same objective criminal intent, they constituted the same criminal conduct. The court erred in counting these as separate points toward Hatt's offender score.

We remand for resentencing after recalculation of offender score consistent with this opinion.

V.      Criminal Filing Fee

Hatt contends that the court imposed a $200 criminal filing fee in error because he is indigent. After Hatt was sentenced, a change in the law made it impermissible to impose discretionary costs on indigent defendants and the Supreme Court held that this change applies prospectively to cases on appeal. LAWS OF 2018, ch. 269, § 17(2)(h); State v. Ramirez, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). The State argues that the $200 criminal filing fee was mandatory at the time it was imposed, but concedes that the fee should be stricken in light of Ramirez. Because the parties do not dispute this issue, the criminal filing fee should not be included in the new judgment and sentence.

VI.     Preservation of Evidence

In a statement of additional grounds for review, Hatt contends that the State failed in its duty to preserve and disclose evidence when it failed to obtain video evidence of the shooting allegedly caught on Hatt's security camera. He raised this issue below in a motion to dismiss pursuant to State of Arizona v. Larry Youngblood, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), and CrR 8.3(b). The court denied this motion orally, reasoning that "the defense has failed to prove that there was particular evidence that existed and that, if it did, it would have been helpful to the defense and that the State did anything wrong with regard to it."

We review a claimed violation of a defendant's constitutional right to due process de novo. State v. Johnston, 143 Wn. App. 1, 11, 177 P.3d 1127 (2007). However, a trial court's findings of fact on a motion to dismiss for failure to preserve

potentially exculpatory evidence are reviewed for substantial evidence. See State v. Ortiz, 119 Wn.2d 294, 301–02, 831 P.2d 1060 (1992), overruled on other grounds by State v. Condon, 182 Wn.2d 307, 343 P.3d 357 (2015). As stated above, "[s]ubstantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." Hill, 123 Wn.2d at 644.

To comply with the Fourteenth Amendment's guarantee of due process, the State "has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense." State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994) (citing Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); California v. Trombetta, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). If the State fails to preserve material exculpatory evidence, the criminal charges must be dismissed. Id. at 475. Failure to preserve evidence that does not rise to the level of "material exculpatory evidence" but is "potentially useful" to the defense only constitutes a denial of due process if the defendant can show bad faith on the part of law enforcement. Youngblood, 488 U.S. at 57–58.

A case report indicates that officers secured the property on November 10, 2015. In a recorded interview with police on the same day, Sycks indicated she had heard a rumor that a game camera had recorded Hatt driving Spencer's car. When the search warrant was executed on November 11, 2015, officers observed a camera on a pole, but the cable attached to the camera was cut. The same day, Fincher indicated in a second recorded interview with police that there was a

camera pointing at the driveway on the property, but Hatt had told him the camera was not recording. Fincher assumed that Hatt saw Spencer drive onto the property on the live camera feed.

Jamie Wilson told police that she had gone to the property on November 12, 2015 and found three video home system (VHS) cassette tapes labeled with women's names in the house. She took the tapes because she had heard a rumor that Hatt set up a tripod to record the shooting, but she admitted she did not have any evidence to substantiate this rumor. She indicated that she had not watched the tapes but would try to turn them over to police.

Zane Smith also spoke with the police that day and indicated that his brother had a computer tower that belonged to Hatt. He said that there was a digital image on the computer that showed Hatt shooting a .50 caliber rifle. The police report indicates that detectives followed up with both Wilson and Smith but were not able to contact them again, and police did not recover the property.

In a recorded interview with police on November 12, 2015, Espy, Hatt's longtime girlfriend, confirmed that Stamey's call was the only reason they knew Spencer was driving onto the property. She stated that she had not seen the shooting but had heard two shots. Epsy told the detective that Hatt did not tell her what happened but she believed Hatt had killed Spencer. The detective asked if there was any other information that she thought would be important and she said there was not.

On November 19, 2015, Espy had a second recorded interview with Snohomish County detectives. She repeated that Stamey had called to tell them

Spencer was approaching. She stated again that Hatt went out the kitchen door after Spencer drove up and then she heard two shots soon after. When pressed by the interviewing detective, Espy insisted that she did not see the shooting happen. She acknowledged again that she believed that Hatt killed Spencer. She also admitted that she had lied in her first recorded interview about where Hatt was, about a note from Hatt in her car, and about not seeing the body because she was trying to protect Hatt. She reported that he had explained the events to others by saying that Spencer had burglarized the house and was a threat to them, so he took care of the threat. She said that he had never told her that Fincher shot Spencer and indicated there was "no question" that Hatt was the shooter.

Defense counsel submitted a declaration detailing the relevant facts to the best of his knowledge with the motion to dismiss. In the declaration, he stated that both parties had been forwarded a letter on December 5, 2016 by an Assistant United States Attorney that Espy wrote as part of a federal criminal case in which she was involved. In the letter, Espy wrote that she watched Fincher shoot Spencer through the live security camera feed.

Defense counsel interviewed Espy on January 18, 2017. She stated that there were three cameras at the house: one on the utility pole, one on the shed, and a small, battery-operated game camera on a tree. She said she had not been able to find the game camera and thought someone had taken it. She explained that the other cameras were connected to the computer inside the house and they could watch the live feed on the television or computer monitor. She thought the camera would record for about six hours and then record over itself. She said the

camera data was stored on the computer. Espy stated that the house had been burglarized after the shooting and all of the computer equipment and cameras, except for the one on the utility pole, had been taken.

She said again that Stamey had called to tell them Spencer was coming, but also stated that they would have seen his car on the feed when he got a little closer. She indicated that the cameras weren't recording on the night of the shooting. She then stated that she and Hatt saw Spencer arrive on the live feed and she saw Spencer hitting Fincher with his right hand closed around an object. After Hatt went outside, Espy said she saw on the feed that Spencer was holding a gun. She could not see Hatt on the monitor but knew he was off-screen on the left side of the camera's field of view. She heard the two shots and thought they came from the right side of the screen. She admitted she did not see Fincher shoot Spencer, but assumed he had based on the way the body fell. When asked about her assertion in the letter from the federal case, she explained that, although she had not seen it happen, she believed that Fincher had shot Spencer. She believed that Hatt was not the shooter because she didn't see a gun in his hand when he left the house and she didn't believe he could kill someone.

In this case, the trial court's factual conclusion that Hatt had failed to prove that the video evidence existed was supported by substantial evidence. Regardless of whether Espy watched the live feed of the shooting, she and Fincher both stated that they believed the camera was not recording at the time of the shooting. If the camera was recording, there was nothing to suggest that the recordings had been preserved, rather than automatically overwritten, and would

be found on the computer in Smith's brother's possession. Nor was there any evidence to suggest that the digital files on the computer had been transferred onto the VHS tapes that Wilson took from the property. A reasonable fact-finder could conclude that Hatt had not shown that the allegedly relevant evidence existed. The court did not err in denying the motion to dismiss.

VII. Speedy Trial

In a statement of additional grounds for review, Hatt also contends that the trial court failed to protect his right to a speedy trial in violation of the United States and Washington Constitutions and CrR 3.3.

Hatt was arraigned on November 16, 2015, and trial was set for January 8, 2016. On December 17, 2015, the State indicated that it was still in the process of providing discovery to the defense. Hatt's counsel requested a "Campbell[3] continuance" for more time to review discovery. Hatt objected to the continuance, citing his rights to a speedy trial and due process. The court stated that it had "no doubt" that defense counsel "could not possibly be prepared adequately" to go to trial in less than two months on a charge that carried a possible sentence of up to 50 years. The court explained that it was balancing Hatt's right to a speedy trial with his right to adequate representation. The court continued the trial to April 8, 2016 and requested that counsel file affidavits "outlining what needs to be done so the record can be clear" if further continuance was requested without Hatt's agreement.

---

[3] State v. Campbell, 103 Wn.2d 1, 691 P.2d 929 (1984).

On February 3, 2016, defense counsel moved to continue the trial to September 9, 2016. The parties indicated that discovery was still ongoing and defense counsel had personal conflicts in June, July, and August that would not permit a trial of the length expected. Hatt objected to the continuance because he wanted a speedy trial, but defense counsel indicated that Hatt had signed a Campbell continuance form. The court found good cause to continue the trial and reset the date as requested.

On June 30, 2016, both parties asked that the trial be continued to February 17, 2017. The State indicated that negotiations were taking place after significant delay in obtaining documentation of Hatt's prior out-of-state convictions. Defense counsel explained that he still needed to conduct witness interviews and other investigation and a continuance was necessary to ensure that he was effectively representing Hatt. Hatt objected, and the court found good cause to continue the trial over his objection.

On January 27, 2017, defense counsel requested to continue the trial date in order to be able to provide effective representation at trial. He indicated that he needed more time to interview witnesses and prepare motions and that co-counsel had been appointed to help speed up the process. Hatt objected, citing his right to a speedy trial. The court clarified that it understood his objection:

> THE COURT: If I understand your position, then, Mr. Hatt, you're not saying that the delay would prejudice your defense. You're just saying you're tired of all this delay. Is that about right?
>
> THE DEFENDANT: Yes, your Honor. But, of course, I do object to this because I do feel it is—it is prejudice to my, you know, speedy trial rights.

THE COURT: I got that. Prejudice to your rights but not to your preparation for trial. They're different.

THE DEFENDANT: No, he needs it. I can't argue. I'm happy with everything Mr. Schwarz has done up to this point. I have no complaints.

THE COURT: All right. Thank you, sir.

The court explained to Hatt that it was balancing his speedy trial right with his right to effective assistance of counsel and "the one that will prevail today is your right to effective assistance." The court continued the trial to April 28, 2017, "finding good cause to continue until that date based upon the need for Mr. Schwarz to be prepared for trial."

A.    CrR 3.3

We review de novo whether the trial court violated CrR 3.3. State v. Kenyon, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). States can prescribe reasonable periods for commencement of trials consistent with constitutional standards. Barker v. Wingo, 407 U.S. 514, 523, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Under Washington's speedy trial rule, a defendant who is detained in jail must be brought to trial within 60 days of arraignment. CrR 3.3(b)(1)(i), (c)(1). Continuances appropriately granted by the court are excluded from the calculation of time to trial and extend the allowable trial date to 30 days after the end of the excluded period. CrR 3.3(b)(5), (e)(3), (f).

The court may grant a continuance on its own motion or the motion of a party when the administration of justice so requires and the defendant will not be prejudiced in the presentation of his defense. CrR 3.3(f)(2). When a defendant's counsel brings the motion requesting the continuance, the defendant's objection

to the requested delay is waived. CrR 3.3(f)(2); <u>State v. Ollivier</u>, 178 Wn.2d 813, 824, 312 P.3d 1 (2013). If a defendant is not brought to trial within the applicable time period, the court must dismiss the charges with prejudice, provided the defendant objects within ten days after notice of trial setting is mailed or otherwise given. CrR 3.3(d)(3), (h).

As a threshold matter, we consider whether this issue is preserved for appeal. The court must dismiss a prosecution for violation of CrR 3.3 on a motion by the defendant. <u>State v. Barton</u>, 28 Wn. App. 690, 693, 626 P.2d 509 (1981). "The motion must be specific enough to direct the court's attention to the provision of the rule the defendant seeks to invoke and the basis of the motion in order to preserve the issue for appeal." <u>Id.</u> If a defendant does not move to dismiss on this basis before trial, he does not preserve this issue for appeal. <u>State v. Mason</u>, 31 Wn. App. 680, 685, 644 P.2d 710 (1982).

Here, defense counsel raised the speedy trial issue to the court during pre-trial motions as follows:

> [MR. SCHWARZ:] Number 4 is essentially a preservation of a constitutional speedy trial issue.
> You weren't present for all the prior hearings. Mr. Hatt has objected to every continuance in this case. Every continuance has been a <u>Campbell</u> continuance or something of that nature.
> Mr. Hatt wishes to preserve that issue here today. I believe he has to raise it again to preserve it. We're raising it again as sort of the cumulative effect of the continuances. Again, it's hard for me to do that because of a <u>Campbell</u> continuance. I was the one asking for the continuance. I'm in a somewhat awkward position here.
> But nonetheless, this is something that both Mr. Hatt and I have come up with together, and I am—it's here to preserve those issues—
>
> THE COURT: It's not a motion. It's just a record.

MR. SCHWARZ: It is a record.

THE COURT: All right. Very well. Then there's nothing for me to rule upon. Next.

Because defense counsel accepted the court's characterization of this as "just a record" rather than a motion and the court did not make a ruling, it appears that this issue has not been preserved for appeal. Even if this record was sufficient to preserve the CrR 3.3 issue, Hatt's objection to the delay is waived because his counsel requested each of the continuances over his objection.[4] Accordingly, Hatt cannot contest the alleged violation of CrR 3.3.

B.    Constitutional Speedy Trial Right

Although the purpose of CrR 3.3 is to ensure that a defendant's constitutional right to a speedy trial is protected, compliance with the rule does not necessarily mean that no constitutional violation has occurred. Ollivier, 178 Wn.2d at 823. We review a claim of a constitutional violation de novo. State v. Iniguez, 167 Wn.2d 273, 280, 217 P.3d 768 (2009).

"[T]he analysis for speedy trial rights under article I, section 22 [of the Washington Constitution] is substantially the same as the Sixth Amendment analysis." Ollivier, 178 Wn.2d at 826 (citing Iniguez, 167 Wn.2d at 289). The United States Supreme Court adopted a balancing test in Barker to analyze alleged speedy trial right violations. Iniguez, 167 Wn.2d at 283 (citing Barker, 407 U.S. at 530). Some delay in bringing a case to trial is both necessary and inevitable. Id.

---

[4] It is not clear from the verbatim report of proceedings whether defense counsel brought the motion for a continuance granted on December 17, 2015. However, counsel's characterization of the matter as a "Campbell continuance" suggests it is a request for a continuance by defense counsel to ensure effective representation but objected to by the defendant, as was approved in Campbell, 103 Wn.2d at 15.

To trigger the balancing analysis, a defendant must first show that the delay "crossed a line from ordinary to presumptively prejudicial." Id. (citing Doggett v. United States, 505 U.S. 647, 651–52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992); Barker, 407 U.S. at 530). This inquiry is necessarily fact-dependent and relative; for example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Barker, 407 U.S. at 531. The Washington Supreme Court has rejected "a formulaic presumption of prejudice upon the passing of a certain period of time" in favor of a fact-specific analysis of the length of delay, complexity of the charges, and reliance on eyewitness testimony. Iniguez, 167 Wn.2d at 292.

In Iniguez, the Washington Supreme Court found the eight-month delay in a first-degree robbery case to be "just beyond the bare minimum needed to trigger the Barker inquiry under these circumstances." Id. at 293. In Ollivier, a delay of 23 months was sufficient to trigger the Barker analysis in a prosecution for possession of child pornography. 178 Wn.2d at 819, 828. Division Three of this court found an 18-month delay sufficient to trigger a Barker analysis in a prosecution for first degree murder where the defendant spent the entire time in custody and eyewitness testimony was a critical part of the State's evidence. State v. Gallegos, No. 32841-4-III, slip op. at 19–20 (Wash. Ct. App. Oct. 13, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/328414_unp.pdf.

Hatt was charged by information on November 13, 2015. The affidavit of probable cause indicated he was not yet in custody at that time, so the charging initiated the time-to-trial calculation. The length of delay from charging to trial was

- 38 -

approximately 18 months. Hatt was in custody for nearly the entirety of this period. This delay is sufficient to trigger the Barker analysis.

To determine whether a defendant's constitutional right to a speedy trial was violated, Barker requires that a court consider the "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530. The length of delay once presumptive prejudice has been established is a different assessment than during the threshold phase. Iniguez, 167 Wn.2d at 293. In assessing this factor, the Supreme Court has considered the fact that the bulk of the continuances were sought by defense counsel to ensure adequate preparation to be "an extremely important aspect of the balancing test." Ollivier, 178 Wn.2d 831. In Ollivier, the court concluded that this first factor weighed against the defendant when "the length of delay was reasonably necessary for defense preparation." Id. at 831.

The second factor that the court considers under Barker is the reason for the delay. 407 U.S. at 530. "When the delay is due to trial preparation needs . . . the first and second factors are closely related." Ollivier, 178 Wn.2d at 831. In assessing this factor, the court evaluates each party's responsibility for the delay and considers each party's blameworthiness and the impact on the defendant's right to a fair trial. Barker, 407 U.S. at 531. "Delay caused by defense counsel is chargeable to the defendant." Ollivier, 178 Wn.2d at 832.

The third Barker factor is the defendant's assertion of his right to a speedy trial. 407 U.S. at 530. Failure to assert a speedy trial right will pose an obstacle to proving that a defendant was denied a speedy trial. Id. at 531.

Finally, the court must consider whether the delay prejudiced the defendant. Id. at 532. This factor necessitates consideration of the interests of the defendant that the speedy trial right was designed to protect: prevention of oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. Id. To show that their constitutional right to a speedy trial has been violated, a defendant ordinarily must establish actual prejudice. Ollivier, 178 Wn.2d at 840. Where prejudice is not presumed due to an extreme delay, a defendant must establish "particularized prejudice that would weigh heavily against the State." Id. at 844.

The third form of prejudice, possible impairment to the defense, is the most important "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Barker, 407 U.S. at 532. Hatt contends that his defense was impaired because of the loss of the allegedly exculpatory video evidence. However, as discussed above, the trial court reasonably concluded that Hatt had not shown the existence of that evidence. There is no indication that the delay caused witnesses to become unavailable or extant evidence to disappear. In fact, defense counsel indicated he was not adequately prepared to take the case to trial at any earlier time. Hatt has not shown any actual prejudice to his defense from the delay.

On balance, the Barker factors weight against Hatt. Like Ollivier, the delay in this case was principally requested to ensure that defense counsel was prepared to provide effective assistance to Hatt. Defense counsel stated that he could not be ready for trial until the end of April 2017. Although Hatt objected to the delay

and was subject to comparatively strict conditions of detention, the delay was not unduly long, the reasons for delay were primarily attributable to the defense and necessary to ensure adequate representation, and he has not shown any particularized prejudice resulting from the delay. Hatt's constitutional right to a speedy trial was not violated.

Remanded for resentencing.

WE CONCUR:

Andrus, J.