# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59569-9-II |
| Respondent, | |
| v. | |
| DARIUS TREVON HAMMOND, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Darius T. Hammond appeals his convictions for first degree murder with a domestic violence designation and first degree unlawful possession of a firearm. He argues that the trial court erred by: (1) violating his time-for-trial and speedy trial rights, (2) entering convictions unsupported by sufficient evidence, (3) admitting evidence that was not provided to Hammond until after the commencement of trial, and (4) violating double jeopardy during sentencing. Hammond makes several additional claims in his statement of additional grounds (SAG). We affirm.

FACTS

On the morning of October 28, 2023, law enforcement responded to a report that a woman's body had been found in a field on North Pearl Street. The woman, later identified as Jadell Williams, was declared dead at the scene.[1] Jadell had died from a gunshot wound to the neck. Ex. 51. A gun was found with her body.

---

[1] Because Jadell shares the same last name as her mother, Della Williams, who was a witness in this case, we refer to them by their first names for clarity.

As part of the investigation, law enforcement canvassed the area around the field where Jadell's body was found, asking neighbors if they had seen or heard anything. Four of the interviewed witnesses had heard gunshots between 5:00 and 5:30 a.m.

Hammond became a suspect in the investigation when law enforcement discovered that Hammond and Jadell had previously been in a romantic relationship and that Hammond's mother lived just blocks away from where Jadell's body was found. Based on this information, officers eventually arrested Hammond.

The State charged Hammond with one count of first degree murder, two counts of second degree murder, and one count of first degree unlawful possession of a firearm.[2] The State later amended the information to designate all three of Hammond's murder charges as crimes of domestic violence. While awaiting trial, Hammond was held in jail.

## I. CONTINUANCES AND PRETRIAL MOTIONS

### A. INITIAL CONTINUANCE AND HAMMOND'S MOTION TO PROCEED PRO SE

After Hammond's initial arraignment, which appears to have been on October 30, 2023,[3] trial was set for December 19, 2023. As the case proceeded, Hammond's defense counsel, without Hammond's agreement, requested a continuance, which the trial court granted on December 7, 2023. The trial court's written order stated that the continuance was granted under CrR 3.3(f)(2) because discovery and the defense investigation were not complete, because "defense counsel

---

[2] All of Hammond's murder charges included firearm enhancements.

[3] Although our record does not include a minute entry for the date of Hammond's arraignment, the State represents the arraignment date as the same date the information was filed.

would be ineffective if [the] case went to trial on current trial date," and because the State's co-counsel was on leave.[4]  Clerk's Papers (CP) at 376.  The trial was continued to February 29, 2024, with a new time-for-trial deadline of March 29, 2024.

Six days later, Hammond moved to proceed pro se.  After engaging in a colloquy with Hammond and advising him about the disadvantages of self-representation, the trial court granted Hammond's request, finding it to be "made knowingly, voluntarily and intelligently."  CP at 19.

In January 2024, Hammond filed a motion to dismiss his case under CrR 3.3 and 8.3.  Hammond argued that his time-for-trial rights under CrR 3.3 and speedy trial rights under the Sixth Amendment had been violated when the trial court granted the continuance on December 7.  He contended that his prior defense counsel had made the request over his objection and that he had the right to be brought to trial within 60 days under CrR 3.3.  Hammond's motion appears to have been denied (neither the trial court's order nor a transcript of the hearing are contained in our record).

B.  STATE'S REQUEST FOR CONTINUANCE

On February 13, the State moved for a second continuance.  The State explained that it was still awaiting forensic testing results from the crime lab and that Hammond, given his recent change to self-represented status, still had not received all of the State's discovery.

With respect to the test results, the State asserted that it had just learned that day that investigators had recovered a bullet from Jadell's autopsy and had just sent it to the crime lab for

---

[4] There is no transcript in our record of the December 7 hearing.

ballistics testing. The State was also still awaiting DNA test results that had been ordered about a month earlier.

As for the effect of Hammond's self-represented status, the State said that Hammond's location in the jail created logistical barriers to providing discovery to him. Hammond had still not received "many, many pages of discovery, including all of the contents of the victim's phone, the medical exam report, as well as the testing that [was] still outstanding." 2 Verbatim Rep. Proc. (VRP) (Feb. 13, 2024) at 8. The State explained that all electronic discovery had to be converted into a specific media format in order to be viewable by Hammond in jail.

The State claimed that despite these challenges, it was trying to get Hammond the missing discovery as quickly as possible.

> THE COURT: . . . So basically, everything that you have in paper form has been provided as soon as you can go through the turnaround process with legal assistants to get it duplicated and sent over to Mr. Hammond. Is that a fair statement?

> [THE STATE]: Yes, Your Honor, that is a fair statement. In fact, I even asked for some items to try to be converted into PDF or printable documents as much as we feasibly can, some of the results from the [Universal Forensic Extraction Device] search, but there's still some media concerns.

2 VRP (Feb. 13, 2024) at 10. Because of these delays, the State asked for a two-month continuance. Hammond objected based on his speedy trial and time-for-trial rights.

The trial court granted the State's motion, but it continued the trial only three weeks, to March 20. The trial court reasoned that because the State had not filed a formal written motion, it was going to continue the trial only within the current time-for-trial window and would not further extend the time-for-trial. The trial court wrote in its written order that trial was being continued

because "outstanding discovery needs to be provided to defendant; ballistics, DNA, and testing on firearm needs to be completed;" and the State's co-counsel was on leave. CP at 35.

Two days after the trial court's order, Hammond filed another motion to dismiss under CrR 3.3, arguing again that the continuance violated his time-for-trial and constitutional speedy trial rights (and that, by entering the order, the trial court violated judicial ethics under the Code of Judicial Conduct (CJC)). The trial court again denied his motion.

The case proceeded to a bench trial on March 20, 2024, the date specified in the trial court's February 13 order of continuance.

## II. TRIAL COURT'S ADMISSION OF DNA EVIDENCE

On March 22, two days *after* the start of trial, the State disclosed certain outstanding discovery to Hammond, including the DNA test results, a supplemental report from the lead detective, and records from the medical examiner. Hammond objected to the late discovery, arguing that its admission would unfairly prejudice him.

The State acknowledged that the discovery was late but said that it "got [this evidence] as soon as it was available." 3 VRP (Mar. 25, 2024) at 296. The State explained,

> This case started 140 days after arraignment. This is a murder case, and we have—we have done everything I feel like we could do to get the testing completed in this case. Not only DNA, but, for example, firearms examination, ballistics, which happened at the same time. That was also completed very recently. The results were [then] provided to Mr. Hammond.

3 VRP (Mar. 25, 2024) at 295-96.

The trial court overruled Hammond's objection and allowed the admission of the DNA evidence as well as the other discovery. The trial court reasoned that Hammond wanted to go to trial and had objected to the State's earlier motion for a continuance based on the outstanding DNA

5

and ballistics testing. And because Hammond had objected to continuing the trial, the State had "facilitated and expedited getting that testing done" and had ensured that Hammond received the testing results "when they were available." 3 VRP (Mar. 25, 2024) at 296.

Included in this discovery were DNA and ballistics test results showing that Hammond's DNA could *not* be tied to the gun found on Jadell's body at the time of her death. There was also no evidence that the bullet that killed Jadell had come from that gun.

III. TRIAL TESTIMONY

A. DETECTIVE ARASIM'S TESTIMONY

Detective Arasim, the lead detective on Jadell's case, testified about his investigation. As the lead detective, Arasim was in charge of assigning duties to different law enforcement officers coordinating the investigation.

1. Video Footage

Arasim testified that, as part of the investigation, he compiled and watched video surveillance footage from multiple businesses near the field where Jadell's body was found on North Pearl Street.

He described footage from surveillance cameras at "Garry's on Pearl," a business about six to seven blocks from the field where Jadell's body was found, that was taken at around 1:30 a.m. on October 28. The footage showed Jadell purchasing a pack of "Newport" cigarettes. Hammond then enters the store separately, but they are seen leaving together and walking in the direction of Hammond's mother's house on Pearl Street.

Arasim also described different footage from Garry's on Pearl recorded hours later from 5:00 a.m. to 5:30 a.m. Jadell is seen carrying a black duffel bag and Hammond is seen "wearing

light blue jeans and what looks like a Chicago sweatshirt." 4 VRP (Mar. 27, 2024) at 431. On this footage,

> [Jadell] was seen leaving [at 5:12] going south towards where she was found . . . and then shortly later [Hammond] is seen running back at 5:28 with a black duffel bag that he wasn't carrying when he left, when he was following her.

4 VRP (Mar. 27, 2024) at 431.

Arasim also viewed footage taken around 5:12 a.m. from a different location, "Vie Athletics," a store approximately a seven-minute walk from the field where Jadell's body was found. Arasim explained that in the footage "you see Jadell take off the duffel bag, and then Darius Hammond picks up the duffel bag, and then they leave the parking lot" walking in the direction of the field. 4 VRP (Mar. 27, 2024) at 483. The video also shows Jadell and Hammond walking together at around 5:15 a.m. Then, approximately fifteen minutes later, the Vie Athletics video shows Hammond "running north on the east sidewalk of North Pearl Street, carrying [Jadell's] duffel bag." 4 VRP (Mar. 27, 2024) at 487; *see also* Ex. 61.

2. Investigation into Hammond

Arasim testified that Hammond became a person of interest in the investigation after law enforcement learned that Hammond and Jadell had been in a relationship previously and that Hammond's mother lived in the area.

Arasim explained that Hammond was later arrested at his mother's house and taken into custody. During the subsequent search of the mother's house, law enforcement found a black duffel bag that matched the one Jadell was seen carrying in the video footage hidden in a shed in the backyard. Found inside the bag, among other things, were Jadell's wallet and I.D., and a box of Newport cigarettes.

7

Arasim testified that they also found a Chicago sweatshirt similar to the one worn by the man accompanying Jadell in the videos. Jadell's cell phone was also recovered in the search of Hammond's mother's house, hidden "on the back porch in a sock in between the table." 4 VRP (Mar. 27, 2024) at 413.

After his arrest, Hammond was interviewed by Arasim and another officer. Arasim testified that Hammond admitted during the interview that he had been in a relationship with Jadell and that their relationship had been "[s]exual in nature." 4 VRP (Mar. 27, 2024) at 435.

3. Jadell's Cell Phone Data

Law enforcement received a warrant to have the data extracted from Jadell's cell phone that was found during the search of Hammond's mother's house. From the resulting report of the phone's call log, text messages, web history, photos, and audio, Arasim reviewed specific text message threads, including one between Jadell and the contact "Grandson for President," and one between Jadell and a number ending in 8693. 4 VRP (Mar. 27, 2024) at 453.

Arasim testified that they were able to trace both the contact "Grandson for President" and the number ending in 8693 to Hammond. 4 VRP (Mar. 27, 2024) at 456, 465. For the "Grandson for Present" contact, Arasim learned that Hammond was the listed subscriber for that phone number through a search warrant to the phone carrier. For the 8693 number, Arasim learned that it belonged to Hammond based on the content of the messages. He explained,

> It was a similar conversation that was going on as in Grandson for President's conversation. Also, in there he sends an address of [Hammond's mother's house], which made me believe it was still [Hammond].

> In there Jadell also [appears] to ask if that's [Hammond] during the text message thread, and then also she asks for his Whatsapp number, and provides the number used for Grandson for President.

8

4 VRP (Mar. 27, 2024) at 465. Arasim read the contents of some of these text message threads at the trial. Included in these text messages was the following message sent by Hammond to Jadell on October 27 at 10:33 a.m.

I'm about to smoke you and your family tonight or very soon. Watch.

4 VRP (Mar. 27, 2024) at 473.[5]

### B. DELLA WILLIAMS' TESTIMONY

Jadell's mother, Della Williams, testified about Jadell's relationship with Hammond, explaining that Della had met Hammond in the summer of 2023. At the time, Jadell and Hammond had recently started "dating" and they were "boyfriend and girlfriend." 1 VRP (Mar. 20, 2024) at 50. Della testified that she believed that their relationship ended in August 2023.

### C. NEIGHBORS' TESTIMONY

Four neighbors who lived close to the field where Jadell's body was found testified at trial. All of them testified that on October 28, at some time between 5:00 a.m. and 5:30 a.m., they had heard two gunshots. One neighbor testified that the two shots were about 6 to 7 seconds apart. Although they had heard these gunshots, none of them could see Jadell's body in the field or see anyone at or near the scene.

---

[5] All of the text message threads were admitted into evidence during trial. The detective who extracted the data from Jadell's phone testified that the text messages where the same as the ones that he had extracted from her phone. The extracted messages covered the period from October 15, 2023 to October 30, 2023. In the thread of messages, Jadell and Hammond would go back and forth in conversation. Hammond would refer to Jadell as "boo," "love," "bae," "baby," and "wifey" and sent her a message saying, "[Y]ou have my whole [e]ntire heart." Ex 141-A at 37, 53, 56, 143-A at 10-11, 29-30. There was also an additional message from three days before the killing in which Hammond also threatened to kill Jadell.

IV. VERDICT AND SENTENCING

The trial court found Hammond guilty of all charges: one count of first degree murder—domestic violence, with a firearm enhancement, two counts of second degree murder, domestic violence, with firearm enhancements, and one count of first degree unlawful possession of a firearm.

At sentencing, the State moved to vacate Hammond's second degree murder counts on double jeopardy grounds. The trial court agreed and granted the State's motion.

The trial court entered a judgment and sentence convicting Hammond of first degree murder and first degree unlawful possession of a firearm. The trial court entered a special verdict for a firearm enhancement and designated Hammond's first degree murder conviction as a crime of domestic violence. The judgment and sentence made no reference to the two lesser offenses of second degree murder.

In a separate order, the trial court vacated Hammond's second degree murder counts. The written order stated,

> 1. IT IS HEREBY ORDERED that all orders below are applicable to the convictions of Murder in the Second Degree as listed in counts 2 and 3 of this specific cause number and no other.
>
> 2. IT IS FURTHER ORDERED that the convictions of Murder in the Second Degree obtained by a bench trial and listed as counts 2 and 3, are hereby set aside and vacated.

CP at 343 (boldface omitted).

ANALYSIS

Hammond makes multiple assignments of errors. He argues (1) that the trial court violated Washington's time-for-trial rule when it granted two continuances over his personal objection,

(2) that these delays also violated his constitutional right to a speedy trial, (3) that there is insufficient evidence to support his two convictions as well as the domestic violence designation for his murder conviction, (4) that the trial court erred when it admitted the DNA test results, and (5) that the trial court violated double jeopardy at sentencing. Hammond raises additional claims in his SAG. We affirm Hammond's convictions.

I. TIME-FOR-TRIAL UNDER CrR 3.3

Hammond argues that the trial court erred when it granted two continuances, the first requested by defense counsel in December 2023 and the second requested by the State in February 2024. According to Hammond, both continuances violate CrR 3.3, Washington's time-for-trial rule.

A. LEGAL PRINCIPLES

We will not disturb a trial court's decision to grant or deny a motion for a continuance unless it was an abuse of discretion. *State v. Ollivier*, 178 Wn.2d 813, 822-23, 312 P.3d 1 (2013). A trial court abuses its discretion if it is manifestly unreasonable or untenable. *State v. Saunders*, 153 Wn. App. 209, 216, 220 P.3d 1238 (2009).

Under CrR 3.3, a defendant who is detained in jail must be brought to trial within 60 days of arraignment. CrR 3.3(b)(1)(i), (c)(1). If the defendant is not brought to trial within this time limit and the defendant objects within 10 days after notice of trial date setting is mailed, then the trial court must dismiss the charges. CrR 3.3(d)(3), (h).

However, "[c]ertain time periods are excluded from the computation of time, including continuances granted by the trial court." *Ollivier*, 178 Wn.2d at 823. The trial court may continue a trial past 60 days "when such continuance is required in the administration of justice and the

defendant will not be prejudiced in the presentation of [their] defense." CrR 3.3(f)(2). If the continuance is granted, the allowable time for trial extends to 30 days after the new trial date. CrR 3.3(b)(5). When granting a continuance beyond the time-for-trial period, the trial court must make record that they are doing so " 'in the administration of justice' " and for "valid reasons." *Ollivier*, 178 Wn.2d at 823, 825 (quoting CrR 3.3(f)(2)); CrR 3.3(f)(2) ("The court must state on the record or in writing the reasons for the continuance.").

B. The First Continuance — Defense Counsel's December 2023 Request

For the December 2023 continuance, Hammond argues that the trial court erred when it granted defense counsel's motion requesting a continuance because Hammond never agreed to his counsel's motion. We disagree.

If the motion requesting the continuance is brought by defense counsel, CrR 3.3(f)(2) provides that any objection from the defendant to the requested delay is generally waived. CrR 3.3(f)(2) ("The bringing of [a continuance] motion by or on behalf of any party waives that party's objection to the requested delay."); *State v. Hatt*, 11 Wn. App. 2d 113, 150, 452 P.3d 577 (2019), *review denied*, 195 Wn.2d 1011 (2020). In addition, our Supreme Court has consistently held that it is not an abuse of discretion when a trial court grants a continuance "over the defendant's objection to ensure that counsel was adequately prepared and provided effective representation." *Ollivier*, 178 Wn.2d at 824 n.2; *see, e.g.*, *State v. Campbell*, 103 Wn.2d 1, 14-15, 691 P.2d 929 (1984) (holding no abuse of discretion when granting defense counsel's request for a continuance over defendant's objection because the continuance was necessary for defense counsel to effectively represent the defendant given the case's complexity and length); *State v. Luvene*, 127 Wn.2d 690, 698-99, 903 P.2d 960 (1995) (holding no abuse of discretion when granting

defense counsel's request for a continuance over defendant's objection because defense counsel "needed additional time to interview witnesses and to begin preparation for the [death] penalty phase" of the defendant's case).

Hammond acknowledges this general rule, but he contends that it is "not limitless." Br. of Appellant at 42. Relying on our decision in *State v. Saunders*, Hammond appears to suggest that because he "never acquiesced or requested counsel to move for continuances," "verbally objected," and "was frustrated by the pace of the case and wanted to proceed pro se" that the trial court abused its discretion in granting the December 2023 continuance. Br. of Appellant at 43.

In *Saunders*, we held that the trial court abused its discretion when it granted three continuances over the defendant's personal objection because each request lacked "adequate basis or reason articulated by the State or defense counsel," as required by CrR 3.3. 153 Wn. App. at 220. We explained that each of the requests were made either upon agreement by defense counsel and the State in order to further plea negotiations or by "uninformed standby defense attorneys or assigned prosecutors" who could not state a basis for their request. *Id.* We held that these reasons were not "convincing" or "valid." *Id.* at 221.

Hammond urges us to read *Saunders* broadly and to scrutinize the bases underlying the December 2023 continuance. But our Supreme Court has instructed that *Saunders* stands for a limited principle. In *State v. Ollivier*, our Supreme Court said that *Saunders* is limited to situations that specifically involve "continuances . . . *granted to permit ongoing plea negotiations* over [a] defendant's objection and contrary to [their] desire to go to trial," not all cases where a continuance was granted over the defendant's objection. 178 Wn.2d at 825 (emphasis added). *Ollivier* explains the decision of whether to plead guilty is unique in that it is solely in the control of the defendant;

thus, *Saunders'* rationale is inapplicable to situations where a continuance was "sought to enable defense investigation and preparation for trial." *Id.* Such situations are protected by both caselaw and CrR 3.3. *Id.* at 824.

Here, defense counsel requested a continuance because "defense investigation [was] not complete" and because "defense counsel would be ineffective if case went to trial on [the] current trial date." CP at 376. Neither party referenced plea negotiations as the basis for the continuance. Thus, *Saunders* does not help Hammond. Indeed, the reasons expressed by defense counsel for the continuance are squarely within the legitimate bases under CrR 3.3 and the case law for a continuance over the defendant's objection. *See* CrR 3.3; *Ollivier*, 178 Wn.2d at 824 n.2. Accordingly, we hold that the trial court did not abuse its discretion in granting the December 2023 continuance.[6]

C. THE SECOND CONTINUANCE — STATE'S FEBRUARY 2024 REQUEST

Hammond argues that the trial court also erred when it granted the second continuance following the State's motion in February 2024. Hammond first describes the second continuance as being rooted in DNA testing delays, and then, relying largely on *State v. Denton*, 23 Wn. App. 2d 437, 516 P.3d 422 (2022), he argues that without the State doing more to explain the backup at the crime lab, a continuance was improper.

---

[6] We note that as the reviewing court, we are limited by our record. Because our record does not include the trial court's oral ruling for the first continuance request, we reference only the trial court's reasoning included in its written order. Notably, Hammond makes no argument about this continuance that rests on the specific language or oral reasoning used by the trial court. Nor would we expect such an argument because a party has the obligation to supply the record to support their argument. *State v. Barry*, 183 Wn.2d 297, 317, 352 P.3d 161 (2015) ("The party presenting an issue for review has the burden of providing an adequate record to establish error.").

In *Denton*, Division Three determined that the trial court abused its discretion when it granted multiple continuances over the defendant's objection, based on "expected and routine" delays in getting DNA evidence from the crime lab. 23 Wn. App. 2d at 457-58. Division Three explained that because the State and the trial court provided "[n]o detailed, admissible evidence of the reasons for the backup, efforts taken to get around it, or a reasonably short time frame within which trial could be held," and appeared to have a general sense of apathy about the 204-day delay, there was not a sufficient basis under CrR 3.3 for the trial to be continued past the time-for-trial deadline. *Id.* at 458 It also rejected the possibility that the DNA evidence being exculpatory (and beneficial to the defendant) was a valid basis for continuing the trial date over the defendant's objection, reasoning,

> The defendant may doubt the evidence will prove exculpatory. He or she may deem an early trial more important for other reasons. Either way, it is the defendant's right that the rule protects.

*Id.*

Hammond argues that *Denton* is analogous to the second continuance. He contends that "[t]he State provided no 'detailed, admissible evidence of the reasons for the back-up' or the State's efforts 'to get around it.' " Br. of Appellant at 46 (quoting *Denton*, 23 Wn. App. 2d at 458). Further, he asserts that neither the State nor the trial court considered what a reasonable delay in time-for-trial would be, given the crime lab delays.

The State responds that "Hammond's reliance on [*Denton*] is misplaced." Br. of Resp't at 36. The State argues that unlike in *Denton* where the trial was continued well over the time-for-trial deadline, here, trial was continued to a date that was within it. Additionally, the State argues that the crime lab delays were only part of the reason for continuing trial. According to the State,

the trial court also granted the continuance because Hammond had been unable to review all of the discovery due to his recent self-represented status.

We agree with the State that the trial court did not abuse its discretion. When the State requested the February 2024 continuance, it provided detailed reasoning. The State contended that in addition to the outstanding evidence from the crime lab, Hammond's switch to self-represented status, which had occurred two months prior, had caused delays in the State's ability to provide Hammond with "many, many pages of discovery." 2 VRP (Feb. 13, 2024) at 8. The State explained that it had made an effort to get Hammond the discovery but that the conversion of the discovery to the appropriate format was still taking time. And, although it was not the "primary" reason for the continuance, the State also provided the trial court with details related to the crime lab's delays in getting results for DNA and ballistics testing. The State explained that it had learned the same day as the continuance request that the detective on the case had recovered a bullet from the autopsy and it had just been sent to the crime lab for testing.

Weighing the State's arguments with Hammond's desire to go to trial, the trial court continued the trial only three additional weeks to March 20, 2023—nine days before the time-for-trial period (that resulted from the December 2023 continuance) was set to expire. And it referenced its reasons in its order, specifying "outstanding discovery needs to be provided to defendant; ballistics, DNA, and testing on firearm needs to be completed." CP at 35.

Given the detail included in the State's explanations (including the practical difficulties presented by Hammond's in-custody status), the considerations made by the trial court, and the overall modest impact on the trial date, we cannot say that the trial court's decision was manifestly

16

unreasonable or untenable. *Saunders*, 153 Wn. App. at 216. Thus, the trial court did not abuse its discretion when it granted the State's motion for the second continuance.

II. CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL

Separate from his CrR 3.3 argument, Hammond argues that the trial court violated his constitutional right to a speedy trial when it granted the two continuances. We disagree.

A. LEGAL PRINCIPLES

A criminal defendant's right to a speedy trial is guaranteed by both our federal and state constitutions. U.S. CONST. amend. VI; Wash. Const. art. I, § 22. Although time-for-trial rules are generally created with the purpose of protecting criminal defendants' constitutional speedy trial rights, claims of constitutional violations require their own fact-specific inquiry, which we review de novo. *Ollivier*, 178 Wn.2d at 826.

Whether this right has been violated is dependent on the circumstances—there is no quantifiable number of days or months that definitively shows whether "too much delay has occurred" between a defendant's arraignment and trial. *State v. Iniguez*, 167 Wn.2d 273, 282, 217 P.3d 768 (2009). Compliance or noncompliance with time for trial deadlines imposed by statutes or court rules similarly cannot guarantee whether a constitutional violation occurred. *Id.* at 287 (" '[A] violation of the rules is not necessarily a constitutional deprivation.' " (quoting *State v. Fladebo*, 113 Wn.2d 388, 393, 779 P.2d 707 (1989))); *Ollivier*, 178 Wn.2d at 823 (explaining that compliance with CrR 3.3 is not indicative of whether a defendant's constitutional speedy trial rights have been violated).

Because of the fact-specific nature of constitutional speedy trial rights, we use a balancing test as outlined by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct.

2182, 33 L. Ed. 2d 101 (1972). *Ollivier*, 178 Wn.2d at 827. The *Barker* test generally weighs four nonexclusive factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the level of prejudice to the defendant. *Id.*

Not all of the *Barker* factors have to be analyzed each time a defendant alleges that their speedy trial rights have been violated. The first factor, length of delay, is a "double inquiry;" it serves as both a factor for the overall balancing test and as a threshold showing that the defendant must make before we will analyze the remaining factors. *Id.* at 827-28. To trigger a complete speedy-trial analysis, the defendant must show that the length of the delay " 'crossed the threshold dividing ordinary from presumptively prejudicial delay.' " *Id.* at 827 (internal quotation marks omitted) (quoting *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). Only then will we evaluate " 'the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim' " and proceed to considering the remaining *Barker* factors. *Id.* at 828 (quoting *Doggett*, 505 U.S. at 652).

To determine whether the defendant meets this threshold showing, we consider the length of the delay relative to factors such as the complexity and severity of the charges, reliance on eyewitness testimony, and whether the defendant was in custody. *Iniguez*, 167 Wn.2d at 283, 292. For example, if the case involves heavy reliance on eyewitness testimony, we may have less tolerance for delays in the commencement of trial because delays "could result in witnesses becoming unavailable or their memories fading." *Id.* at 292. Whereas if a case has complex charges or charges with multiple actors, it "might necessitate greater pretrial delay." *Id.*; *see also Hatt*, 11 Wn. App. 2d at 152-53.

B.  APPLICATION

Hammond argues that given the circumstances of his case, the delays in the commencement of trial violated his constitutional rights.  Although Hamond concedes that other cases "address much longer delays than the delay in this case, [he] notes that the facts of this case were relatively straightforward and did not involve complex pretrial discovery; the evidence was largely limited to surveillance videos obtained from businesses near [the crime scene]."  Br. of Appellant at 36. That, combined with his clear and repeated desires to proceed to trial as soon as possible, even if that meant that he would be unable to access or view all of the discovery, Hammond contends, all weigh in favor of finding that these delays violated his constitutional rights to a speedy trial.

The State responds that Hammond fails to meet the threshold showing that is required in order to necessitate consideration of the remaining *Barker* factors.  The State argues that given the seriousness of Hammond's charges, the multiple expert witnesses, and the "numerous" surveillance videos and text messages, a less than five-month delay was not presumptively prejudicial.  Br. of Resp't at 28.  Further, the State argues that because there were no eyewitnesses to the murder and most of the evidence was circumstantial, fading witness' memories was not a concern.

We agree with the State.  A first degree murder case is rarely, if ever, "straightforward." Hammond's arguments to the contrary are unpersuasive.  And, in addition to the case's complexity, Hammond's switch to self-represented status created challenges.  As discussed above, this change created multiple logistical delays in not only getting Hammond the extensive discovery, but also converting many of the files into a format that he could access from jail.  We hold that Hammond has failed to show the threshold *Barker* factor—that the length of the delay " 'crossed the threshold

dividing ordinary from presumptively prejudicial delay.' " *Ollivier*, 178 Wn.2d at 827 (internal quotation marks omitted) (quoting *Doggett*, 505 U.S. at 651). Thus, Hammond's constitutional right to a speedy trial claim fails.

III. SUFFICIENCY OF THE EVIDENCE

Hammond next argues that there is insufficient evidence to support his convictions of first degree murder and first degree unlawful possession of a firearm. He also argues there was insufficient evidence to support the domestic violence designation for his murder conviction. We disagree.

A. STANDARD OF REVIEW

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). We view the evidence in the light most favorable to the State and determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025). We review sufficiency challenges under the same standard regardless of whether the finder of fact was a jury or the trial court. *Id.* at 247.

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). "Evidence of 'resistance to arrest, concealment, assumption of a false name, and related conduct . . . [can] allow a reasonable inference of consciousness of guilt of the charged crime.' " *State v. DeJesus*, 7 Wn. App. 2d 849,

877, 436 P.3d 834 (quoting *State v. Freeburg*, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001)), *review denied*, 193 Wn.2d 1024 (2019).

### B. FIRST DEGREE MURDER

Hammond argues that there is insufficient evidence to support his conviction of first degree murder because, essentially, the evidence is all circumstantial. He contends that the evidence shows that he was merely "in the proximity" of Jadell around the time of her death and that "her belongings" were found at his mother's house, however, it "does not amount to evidence that he was the one who shot her." Br. of Appellant at 28. He also contends that this evidence is not enough to "overcome the complete lack of any forensic evidence linking him to the crime." Br. of Appellant at 28.

To prove first degree murder, the State must prove that the defendant caused the death of another person with premeditated intent. RCW 9A.32.030(1)(a). Premeditation is " 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning for a period of time, however short.' " *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting *State v. Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)). But premeditation must involve "more than a moment in point of time." RCW 9A.32.020(1).

Four characteristics are generally relevant to proving premeditation: "motive, procurement of a weapon, stealth, and the method of killing." *DeJesus*, 7 Wn. App. 2d at 883. And in the context of murder with a firearm, Washington courts will look to (1) the infliction of multiple wounds or shots, (2) the time interval or pause between shots, and (3) the continued firing after missing a first shot. *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006), *overruled on*

*other grounds by State v. W.R.*, 181 Wn.2d 757, 786, 336 P.3d 1134 (2014); *State v. Ra*, 144 Wn. App. 688, 704, 175 P.3d 609 (holding that a "pause" between firing multiple gunshots "supports an inference that [the defendant] had time to deliberate on and weigh [their] decision to kill [the victim]"), *review denied*, 164 Wn.2d 1016 (2008).

Here, the evidence, viewed in its entirety, is sufficient to support the trial court's determination of first degree murder. The morning before Jadell's murder, Hammond threatened to kill Jadell and her family in a text message (and Hammond had sent a similar message three days earlier). In addition, video footage shows that while Hammond was within view of multiple security cameras during parts of the evening that he was with Jadell, he apparently chose to walk with her toward a dark field in a more remote location mere minutes before she was killed. And during that time, witnesses heard two shots, separated by 6 to 7 seconds. Furthermore, Hammond was seen running from the same direction as the field around the time of the murder while carrying Jadell's duffel bag. And law enforcement later found the same duffel bag hidden in a shed behind Hammond's mother's house and Jadell's cell phone hidden in a sock under a table.

From these facts, a reasonable fact finder could infer that Hammond followed through with his threats and, with a deliberately formed plan, killed Jadell that night in a location selected to avoid being seen. *See DeJesus*, 7 Wn. App. 2d at 883. Premeditation is further supported by the delay between the two shots, as six to seven seconds is more than "a moment in time" and provides ample opportunity for time for deliberation. *See Ra*, 144 Wn. App. at 704; RCW 9A.32.020(1). Moreover, as for Hammond being the perpetrator, his apparent effort to hide Jadell's duffel bag at his mother's house shows a consciousness of guilt. *See DeJesus*, 7 Wn. App. 2d at 877.

Despite Hammond's contentions, forensic evidence directly connecting Hammond to the crime or an actual eyewitness to the murder is not necessary. *See Miller*, 179 Wn. App. at 105 ("Circumstantial evidence and direct evidence are deemed equally reliable."). All of the facts that were presented at trial together with all reasonable inferences construed in favor of the State are sufficient to support the trial court's finding of murder in the first degree. Hammond's argument that there was insufficient evidence for this crime fails.

C.  FIRST DEGREE UNLAWFUL POSSESSION OF A FIREARM

Hammond next argues that there is insufficient evidence to support his conviction for first degree unlawful possession of a firearm because "no evidence was provided that linked a gun to [him] and he was not seen with a gun in any of the surveillance videos." Br. of Appellant at 31.

An allegation of first degree unlawful possession of a firearm requires the State to prove that the defendant "owns, accesses, has in the person's custody, control, or possession, or receives any firearm after having previously been convicted . . . of any serious offense." RCW 9.41.040(1)(a).

We are not persuaded that there was "no evidence" linking Hammond to a gun.[7] Although Hammond is correct that there is no video evidence depicting Hammond actually possessing a gun, there is sufficient circumstantial evidence to make that same conclusion. As described above, the facts, including the video footage and the witness testimony about hearing gunshots, lead to a reasonable inference that Hammond killed Jadell with a gun. Moreover, Jadell's autopsy also

---

[7] As for the necessary predicate offense, the parties stipulated that Hammond had previously been convicted of a serious offense at trial.

confirmed that a gun was used (she died from a gunshot wound to the neck). Thus, viewing all of the evidence in the light most favorable to the State, there is sufficient evidence supporting the trial court's finding of first degree unlawful possession of a firearm.[8]

### D. DOMESTIC VIOLENCE DESIGNATION

Hammond next argues that there is insufficient evidence to support the domestic violence designation for his murder conviction. He contends that there is no evidence that his relationship with Jadell was sufficiently close to support such a designation.

Washington law allows certain crimes to receive a domestic violence designation. *State v. Abdi-Issa*, 199 Wn.2d 163, 169, 504 P.3d 223 (2022); RCW 10.99.020(4)(b). The designation has consequences.

> Cases with domestic violence designations are given priority scheduling and courts may issue pretrial no-contact orders. At sentencing, courts may also "impose specialized no-contact orders, violation of which constitutes a separate crime."

*Id.* (footnote and citation omitted) (quoting *State v. O'Connor*, 119 Wn. App. 530, 547, 81 P.3d 161 (2003)). The designation does not create new crimes, instead it "emphasizes the need to enforce existing criminal statutes in such a way that victims of domestic violence are protected." *Id.* at 169-170.

---

[8] Hammond analogizes this case to our decision in *State v. Jussila*, 197 Wn. App. 908, 932, 392 P.3d 1108 (2017), *review denied*, 191 Wn.2d 1019 (2018). In *Jussila*, the State added language in the jury instructions that specified the make, model, and serial of the firearms allegedly used by the defendant for a charge of first degree unlawful possession of a firearm. Because the jury instructions specified this level of detail, we held that the State was required to prove the additional added elements beyond reasonable doubt—which it failed to do. *Id.* at 929, 932. Here, there were no jury instructions, nor any other actions by the State to suggest it needed to prove the detail at issue in *Jussila*. Thus, the case has no relevance.

For the purposes of a domestic violence designation, "domestic violence" pertains to crimes committed by one "family or household member against another" or by an "intimate partner." RCW 10.99.020(4). An "intimate partner" includes "persons 16 years of age or older . . . with whom a person 16 years of age or older has or has had a dating relationship." RCW 10.99.020(8)(f). A "dating relationship," in turn, is "a social relationship of a romantic nature." RCW 7.105.010(9), *see also* RCW 10.99.020(3) (" 'Dating relationship' has the same meaning as in RCW 7.105.010."). In determining whether a dating relationship exists, the court may consider several factors including: "(a) [t]he length of time the relationship has existed, (b) the nature of the relationship, and (c) the frequency of interaction between the parties." RCW 7.105.010(9).

Hammond argues that although there was witness testimony that he and [Jadell] had previously "dated" a couple of months before her murder, "the frequency or seriousness of the relationship was not established in the record." Br. of Appellant at 51. Hammond argues there is insufficient evidence to show that "the interactions between [him] and [Jadell] r[ose] to the level of a 'dating relationship' " as required to establish the domestic violence designation for his first degree murder conviction. Br. of Appellant at 51.

We are unpersuaded. The trial court's domestic violence finding is supported by Della Williams' testimony that Hammond and Jadell were "dating" and "were boyfriend and girlfriend" the summer before Jadell's murder. 1 VRP (Mar. 20, 2024) at 50. Moreover, Hammond's own words suggest a close relationship. In the month before Jadell was murdered, Hammond sent her text messages using names like "boo," "love," "bae," "baby," and "wifey" and sent her a message saying, "[Y]ou have my whole [e]ntire heart." Ex 141-A at 37, 53, 56, 143-A at 10-11, 29-30. Detective Arasim also testified that during the investigation Hammond admitted that he and Jadell

had a relationship that was "[s]exual in nature." 4 VRP (Mar. 27, 2024) at 335. Viewing this evidence in a light most favorable to the State, it is a reasonable inference that Hammond and Jadell were, or at the very least had been, in a dating relationship. Thus, sufficient evidence supports the trial court's domestic violence designation for his murder conviction.

IV. ADMISSION OF DNA EVIDENCE

Hammond next argues that the trial court abused its discretion when it admitted DNA evidence that was provided to him only after trial had started. He contends that, by doing so, the State violated CrR 4.7 and that "he did not have a fair opportunity to evaluate [this] evidence." Br. of Appellant at 54. According to Hammond, these errors by the State and the trial court are sufficient to warrant reversal of his convictions.

CrR 4.7 requires that the State disclose by the omnibus hearing certain discovery documents and information with the defendant that are "within the prosecuting attorney's possession or control." These discovery materials include the contact information of any witnesses the State wishes to call at trial, any written or oral statements of any witnesses or of the defendant, expert reports or results of any physical or mental examinations and scientific tests, or any other discovery that the State intends to use in the trial that were obtained from or belonged to the defendant. CrR 4.7(a)(1), (d). Both parties are subject to a continued duty to disclose—if additional discovery is obtained during trial, the party in possession of that material must promptly notify the other party and the court. CrR 4.7(h)(2).

Because the State's failure to disclose material information as required by CrR 4.7 can implicate a defendant's right to a fair trial, one of the potential remedies is dismissal. CrR 4.7(h)(7)(i). However, the defendant has the burden to prove that prosecution did not act with due

diligence and that they withheld material facts "until shortly before a crucial stage in the litigation process which essentially compelled the defendant to choose between [the right to a speedy trial and the right to adequately prepared counsel]." *State v. Woods*, 143 Wn.2d 561, 582-83, 23 P.3d 1046 (2001).

We review the trial court's decisions to admit or exclude evidence for an abuse of discretion. *State v. Scherf*, 192 Wn.2d 350, 387, 429 P.3d 776 (2018). A trial court abuses its discretion when its decision is manifestly unreasonable or when it reaches a decision based on untenable grounds or for untenable reasons. *Id.*

Here, Hammond fails to meet his burden to show that the State committed a discovery violation. Although he did not receive the DNA evidence until after trial started, he fails to show that the State did not act with due diligence in turning it over to him. Indeed, the record suggests otherwise. The State explained that it did "everything [it] fe[lt] like [it] could do to get the testing completed" within the short timeframe of 140 days of Hammond's arraignment for murder charges. 3 VRP (Mar. 25, 2024) at 295. There is nothing that shows the State did not promptly share the testing results with Hammond as soon as it had them. Because Hammond has failed to meet his burden under CrR 4.7 and because he offers no alternative basis for the trial court to have erred, we hold that the trial court did not abuse its discretion when it admitted the DNA evidence.

V. DOUBLE JEOPARDY

Hammond argues the trial court violated double jeopardy during sentencing. He contends that although the trial court dismissed his two lesser included convictions for second degree murder, it erred when it failed to make the dismissals "with prejudice." We disagree.

The double jeopardy clauses in our state and federal constitutions protect a defendant from receiving multiple punishments for the same offense. *State v. Muhammad*, 194 Wn.2d 577, 618, 451 P.3d 1060 (2019). In the context of double jeopardy, a lesser included offense is considered the "same offense" as the greater offense. *Id.* at 618. And, "[t]he term 'punishment' encompasses more than just a defendant's sentence," as valid convictions can still result in stigma or negative consequences for a defendant. *State v. Turner*, 169 Wn.2d 448, 454-55, 238 P.3d 461 (2010). Thus, when a defendant is found guilty of both the greater and lesser charges, in order to avoid violating double jeopardy, the trial court should enter a judgment and sentence on the greater charge only, *without any reference*—either in its written order, attached to its written order, or in its oral ruling—to the verdict of the lesser offense or offenses. *Id.* at 464-65. Then, once the judgment on the greater charge is final and no longer subject to appeal, "the verdict on the lesser [charges] merge[] into the greater." *State v. Trujillo*, 112 Wn. App. 390, 411, 49 P.3d 935 (2002) (emphasis added), *review denied*, 149 Wn.2d 1002 (2003).

Trial courts also cannot "conditionally" vacate a defendant's lesser convictions, "while directing, in some form or another, that the conviction[s] nonetheless remain[] valid." *Turner*, 169 Wn.2d at 464. Making an "express ruling" that the vacated lesser convictions still retain some validity "keep[s] [them] 'alive' for the purposes of possible reinstatement should the convictions for the greater offense be reversed." *Id.* at 466. In *Turner*, our Supreme Court explained,

> It remains the law that a lesser conviction previously vacated on double jeopardy grounds may be reinstated if the defendant's conviction for a more serious offense based on the same act is subsequently overturned on appeal. However, the lesser conviction, once vacated, and prior to reinstatement, is not "a valid conviction" and is not "entitled to some weight" . . . . In the future, the better practice will be for trial courts to refrain from any reference to the possible reinstatement of a vacated lesser conviction.

28

*Id.* at 466 (footnote omitted); *see also* at 465 n.11 ("We note that our holding today does not abrogate the rule . . . that a lesser conviction previously vacated on double jeopardy grounds can be reinstated following the appellate reversal of a defendant's more serious conviction based on the same criminal conduct. . . . We hold only that the explicit conditional vacation of a lesser conviction, either orally . . . or by written order . . . violates double jeopardy.").

Hammond does not appear to dispute that the trial court properly entered a judgment and sentence that referenced only his conviction for first degree murder. However, he argues that the trial court still violated double jeopardy because in a separate order, the trial court vacated Hammond's lesser convictions for second degree murder without specifying that the convictions were vacated "with prejudice." Hammond appears to contend that the failure to expressly use the phrase "with prejudice" violates current precedent, including *Turner*, because it explicitly keeps his lesser convictions "alive" for reinstatement in the event that his first degree murder conviction is reversed on appeal. He contends,

> In the absence of a specific directive that the counts were dismissed [with] prejudice, the State is free to bring additional charges for the murder in the second degree in the future in the event that Mr. Hammond's conviction in Count 1 is reversed or vacated. Double jeopardy prohibits a second prosecution for the same crime. The trial court erred by dismissing the convictions for murder in the second degree counts without explicitly finding the dismissal [with][9] prejudice.

Br. of Appellant at 58.

---

[9] In this section of his brief, Hammond uses the phrase "without prejudice" twice. Br. of Appellant at 58. The State observes that this is likely a typographical error and, given the context of his argument, Hammond meant to say "with prejudice." Br. of Resp't at 70 n.11. We assume also that Hammond's phrasing was likely inadvertent, and we have corrected the passage accordingly.

The State responds that because the trial court "did not enter a judgment for all three murder convictions, did not 'conditionally dismiss' the second degree murder convictions, and did not find they [were] 'valid' convictions," the trial court did not violate double jeopardy. Br. of Resp't at 68.

We agree with the State—the trial court did not violate double jeopardy or our Supreme Court's holding in *Turner*. The trial court's silence as to whether Hammond's lesser convictions were vacated with or without prejudice falls short of making an "express ruling" or reference that in some way implies that his vacated convictions are still "valid." *See Turner*, 169 Wn.2d at 466. And Hammond has provided no authority that says otherwise. Thus, his argument fails.

## VI. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Hammond raises two additional evidentiary claims. First, like his appellate counsel, Hammond contends that the trial court erred in admitting the DNA test results, except that he appears to claim that the admission violated ER 403. Second, Hammond challenges the admissibility of the text messages between Jadell and him, contending that they were never authenticated to have been sent by him under ER 901.[10]

### A. ADMISSION OF DNA EVIDENCE UNDER ER 403

In Hammond's first claim, he asserts that the DNA evidence should have been barred because it was unfairly prejudicial. Hammond contends that blood tests and polygraph results

---

[10] In his SAG, Hammond also points to an alleged typographical error made in his appellate attorney's brief and contends that the error should not prejudice him. Typographical errors in the Brief of Appellant have not affected our decision.

unfairly prejudiced the criminal proceedings. (Hammond lists a case for support, *State v. Yates*, but fails to include a citation.)

Under ER 403, evidence, even if relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Evidence is unfairly prejudicial when it is more likely to create an emotional response from a fact finder instead of a rational decision. *Scherf*, 192 Wn.2d at 388. We review a trial court's decisions of whether to admit evidence for an abuse of discretion. *Id.* at 387.

Here, Hammond fails to show how the DNA evidence was unfairly prejudicial. In fact, far from eliciting an emotional response, it appears the evidence was helpful to the trial court (and also to Hammond's defense) in that it showed that Hammond's DNA was not present on the gun found with Jadell after her death. Thus, Hammond's first SAG claim fails.

B.  ADMISSION OF TEXT MESSAGES UNDER ER 901

For Hammond's second claim, he contends that the text messages admitted into evidence were sent by a phone number that was not under his name and that he never sent those messages or threatened to kill Jadell and "whoever says [he] did is lying." SAG at 1. Hammond does not appear to claim that the text messages were not actually extracted from Jadell's phone, just that he did not send them.

Before the trial court admits an item into evidence, the party moving to admit the item must show that the item is what it purports to be. ER 901(a). The proponent seeking to authenticate evidence is required to make only a prima facie showing—ER 901 is met "if the proponent shows enough proof for a reasonable fact finder to find in favor of authenticity." *State v. Payne*, 117 Wn.

App. 99, 108, 69 P.3d 889 (2003), *review denied*, 150 Wn.2d 1028 (2004).  " '[T]he proponent of offered evidence need not rule out all possibilities inconsistent with authenticity or conclusively prove that evidence is what it purports to be . . . .' "  *State v. Andrews*, 172 Wn. App. 703, 708, 293 P.3d 1203 (first alteration in original) (quoting *State v. Thompson*, 777 N.W.2d 617, 624 (N.D. 2010)), *review denied*, 177 Wn.2d 1014 (2013).  In making the authentication determination, the trial court considers only the proponent's evidence in favor of authenticity and disregards any contrary evidence that the opponent submits.  *State v. Young*, 192 Wn. App. 850, 857, 369 P.3d 205 (2016), *review denied*, 185 Wn.2d 1042 (2016).  Once a prima facie showing of authenticity has been made, the challenged evidence is admissible under ER 901 regardless of any contrary evidence offered by the opponent.  *Id.* at 855, 857.  After that point, contrary evidence goes to the weight, not the admissibility of the challenged evidence. *Id.* at 857.

Here, the State sufficiently authenticated the text messages extracted from Jadell's phone by making a prima facia showing that they were from Hammond.  The text messages were exchanged with a contact labeled "Grandson for President" and with a number ending in 8693. 4 VRP (Mar. 27, 2024) at 453.  Detective Arasim explained that both numbers were traceable to Hammond because he was the listed subscriber for that "Grandson for President" phone number and because the content of the messages to the 8693 number showed it was Hammond's number, including references to Hammond's mother's address, an address where Hammond had been residing.  This evidence is sufficient to satisfy ER 901.  Hammond's complaints about the accuracy of the State's prima facia showing of authenticity go to the weight of the text messages, not to their admissibility.  *See Young*, 192 Wn. App. at 857.  Thus, Hammond's second SAG claim fails.

CONCLUSION

We affirm Hammond's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

MAXA, J.